MINNESOTA MUT. INV. CO. v. McGIRR et al.

McGIRR et al. v. MINNESOTA MUT. INV. CO.

(Circuit Court of Appeals, Eighth Circuit. February 13, 1920.)

Nos. 5270, 5300.

1. APPEAL AND ERROR ⟨⟩1042(4)—REFUSAL TO STRIKE NOT PREJUDICIAL WHERE ANSWER ENTITLED DEFENDANT TO SOME RELIEF.

The denial of a motion to strike from the answer the facts pleaded as an affirmative defense was not prejudicial error where the facts pleaded entitled defendant to some kind of relief.

2. MORTGAGES ⟨⟩369(7)—EVIDENCE HELD TO SHOW THAT PARTIES CONTEMPLATED PAYMENT BY CORPORATION TO BE ORGANIZED.

In a suit involving the title to land which had been sold on foreclosure of a trust deed to the mortgagees, who conveyed to defendant, evidence *held* to show that it was not contemplated, when the trust deed was given, that the secured notes should be paid by the mortgagor or his brother, the former owner of the land, but that it was intended that the notes should be paid by a corporation to be organized by the parties to acquire title subject to the trust deed.

3. EVIDENCE ⟨⟩434(7)—THAT PARTIES CONTEMPLATED PAYMENT OF MORTGAGE BY CORPORATION TO BE ORGANIZED PROVABLE BY PAROL WHERE FORECLOSURE FRAUDULENT.

In a suit in which relief is sought from a foreclosure sale, it can be shown by parol that it was contemplated when the trust deed was given,

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that the parties would organize a corporation, to take title subject to the trust deed, and that the mortgagor and his brother were not expected to pay the notes, as the foreclosure of the trust deed under such circumstances for nonpayment constituted a fraud.

4. MORTGAGES ☞369(4)—TENDER NOT PREREQUISITE TO RELIEF AGAINST FRAUDULENT FORECLOSURE.

In a suit in which relief was sought against the foreclosure of a trust deed, the fact that no tender of the amount due on the secured notes had been made did not defeat relief where the parties seeking relief did not admit that anything was due from them, but, though conceding that the deed was a valid lien, alleged that its foreclosure under the circumstances was a fraud.

5. EQUITY ☞71(1)—MERE LAPSE OF TIME NOT LACHES.

Mere lapse of time never constitutes laches, but in addition the court must find that it would be inequitable to grant the relief prayed for.

6. MORTGAGES ☞369(5)—PARTIES HELD NOT GUILTY OF LACHES IN SEEKING RELIEF FROM FORECLOSURE SALE.

A party, seeking to set aside the foreclosure of a trust deed, because in violation of the agreement that a corporation would be organized to take title and pay the debt, was not barred by laches, though he waited two or three years, where title was in a purchaser charged with notice, and the parties treated the agreement as still existing, notwithstanding the foreclosure, almost up to the time of the suit.

7. EQUITY ☞427(3)—RELIEF CONSISTENT WITH PLEADINGS AND PROOF OBTAINABLE UNDER GENERAL PRAYER.

Where there is a prayer for general relief, the court having jurisdiction may grant any relief consistent with the pleadings and the evidence.

8. EQUITY ☞57—CASE HELD ONE IN WHICH TO TREAT THAT AS DONE WHICH SHOULD HAVE BEEN DONE.

Where defendants and plaintiff's grantor agreed to organize a corporation to take title to timber lands, and one of defendants acquired title, and executed a trust deed to plaintiff's grantor, who, in violation of the agreement, foreclosed, purchased the land, and conveyed to plaintiff, who purchased with notice, the case *held* one in which to treat that as done which should have been done, in adjusting the equities of the parties, though the agreement could not be specifically enforced.

Appeal from the District Court of the United States for the District of Colorado.

Suit by the Minnesota Mutual Investment Company against Victor C. McGirr, in which Ross E. McGirr filed an intervening petition. From the decree, plaintiff appeals, and defendant and the intervener also appeal. Reversed and remanded, with directions.

No. 5270:

Edwin H. Park, of Denver, Colo. (Thomas H. Gibson, of Denver, Colo., on the brief), for appellant.

Victor C. McGirr, of Pagosa Springs, Colo., for appellees.

No. 5300:

Victor C. McGirr, of Pagosa Springs, Colo., for appellants.

Edwin H. Park, of Denver, Colo., for appellee.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CARLAND, Circuit Judge. [1] This case is here on appeal and cross-appeal. The plaintiff below will be called Investment Company; the defendants, by their respective names. The Investment Company, claiming to be the owner of a large tract of timber land and water ditches connected therewith, located in Archuleta county, Colo., commenced this action June 26, 1917, to restrain Victor C. McGirr from interfering with the possession of said land by the Investment Company, from claiming or pretending to claim title thereto, and from cutting, injuring, damaging, or otherwise interfering with the timber and crops growing thereon. Ross E. McGirr by leave of court filed an intervening petition, and Victor C. McGirr filed an answer to the complaint, wherein each pleaded similar facts which it was claimed entitled them to affirmative relief. A motion to strike from the answer the facts pleaded as an affirmative defense was denied. This ruling is assigned as error. The petition in intervention, however, was not attacked in the court below, and it pleaded the same facts among others as the answer. The facts pleaded in the answer entitled Victor C. McGirr to some kind of relief. We therefore cannot say there was any prejudicial error in denying the motion to strike.

The facts as we find them to be from the record are as follows: Prior to December 10, 1913, Victor C. McGirr had been the owner of the land in controversy. On said date he ceased to be the owner thereof by virtue of the foreclosure of a mortgage thereon given by him to one Henry Schutz and the issuance of a deed pursuant to such foreclosure to the Burns National Bank of Durango, Colo. The land had also been sold subject to the Schutz mortgage to pay a judgment of the United Securities Company. The Durango Bank, however, had agreed that the land in controversy might be repurchased by Ross E. McGirr, trustee, within a reasonable time. In this condition of the land Victor C. McGirr, with the intention of raising money to pay off the liens against the land, and of forming a corporation which should take over the same and such other timber land as could be purchased, for the purpose of cutting and selling the timber thereon, visited Colorado Springs, Omaha, Topeka, Kansas City, Chicago, and finally Minneapolis, Minn. There he met Mason Spicer, Russell Spicer, and Carl Wallace, who were connected with the Meadow Valley Land Company. McGirr estimated that it would require $50,000 to pay the indebtedness against the land, the expenses of incorporating a new company, and such sums as would be required to purchase additional timber. After some weeks of negotiation, Mason Spicer, Russell Spicer, and McGirr went to Colorado for the purpose of examining the land. They visited Pagosa Springs and Durango, but on account of snow could not make a proper examination. The Spicers, however, from such information as they could gather, decided that they could not advance more than $40,000 with the land as security. After further negotiations on February 11, 1914, the Durango Bank and Schutz by quitclaim deeds conveyed the land to Ross E. McGirr for $15,000. February 17, 1914, the United Securities Company conveyed the land by quitclaim deed to Ross E. McGirr for $4,500. February 13, 1914, Ross E. McGirr conveyed the land to Russell Spicer in trust to secure

the payment of four promissory notes each for the sum of $9,875, executed on the same day by said Ross E. McGirr to said Russell Spicer and payable one year after date, with interest at 10 per cent., payable semiannually. On November 7, 1914, the trust deed was foreclosed and the land therein described sold by the public trustee of Archuleta county, Colo., under the power of sale contained in the trust deed without the intervention of court proceedings. The land was bid in at the foreclosure sale by Russell Spicer for the sum of $45,556.49. After the time fixed by law for redemption had expired, and on August 10, 1915, Spicer received the public trustee's deed for the land. The deed recited that notice of the foreclosure sale was published for a period of five consecutive weeks in the Pagosa Springs Sun, and that a copy of said notice of sale was duly mailed by the trustee to the grantor in said deed of trust and subsequent incumbrancers. On May 31, 1916, Russell Spicer conveyed the land to the Investment Company for the expressed consideration of $125,000.

There is no question of innocent purchaser in the case and none is claimed. The Investment Company took the title to the land with knowledge of all the transactions relating to the same which were had between the Spicers and McGirrs. Commencing with the negotiations at Minneapolis, and continuing on through the whole transaction prior to the commencement of this action, it was agreed between Victor C. McGirr and the Spicers that a corporation should be formed for the exploitation of the timber growing upon the land in question, together with such other timber land as Victor C. McGirr might purchase, to which corporation should be conveyed the land in question and such other timber land as should be purchased; that the interest of the Spicers and their associates and Victor C. McGirr in the new corporation should be represented by the issuance of stock; that the common stock should be equally divided between the Spicers and their associates and Victor C. McGirr; that the land in question should be subject to the lien of a trust deed to be executed by McGirr to the Spicers, or one of them, to secure the payment of money to be advanced by the Spicers for clearing the title to the land.

It was also agreed, at the time of giving the trust deed hereinbefore mentioned by Ross E. McGirr, that the notes, the payment of which the trust deed was given to secure should be paid by the corporation which was to be formed, and that the McGirrs, or either of them, should not be liable for the debt thus secured; that the object of the trust deed was to secure the Spicers, or whoever had advanced any money to pay off liens upon the land, or the purchase price thereof paid to the Durango Bank and the Securities Company, pending the formation of the new corporation. It was further agreed between the parties that Victor C. McGirr should organize the corporation and the land in controversy should be conveyed to it; that the Spicers should advance the money to purchase such timber lands from the government or other parties as could be purchased; and that, if the treasury stock of the new corporation could not be sold for sufficient money to pay the indebtedness secured by the trust deed, then the Spicers would take care of the notes themselves. Victor C. Mc-

Girr took possession of the land in controversy as the representative of all the parties to the agreement, and has ever since held possession in such capacity, and not otherwise. The Spicers, after the foregoing agreement was made, assumed to take charge of organizing the new corporation, but never did anything in that regard, although they retained money secured by the trust deed for that purpose. Victor C. McGirr obtained contracts and options for timber lands, and endeavored to purchase such land from the United States, but was wholly unable to do anything in that direction by reason of the refusal of the Spicers to advance the money therefor. Of the amount secured by the trust deed, Victor C. McGirr only received $2,000 in cash, which was used by him in paying expenses connected with the land; the balance being consumed in paying off liens on the land, attorney fees, and a bonus of $7,500, which was deducted from the amount to be advanced. Ross E. McGirr received nothing. He took the title to the land as trustee for Victor C. McGirr and the Spicers.

The trial court found the facts in substance as above stated, but we have stated them more in detail. There are certain items of evidence to which we desire to call attention. We quote the following from the letter written by Mason W. Spicer to Victor C. McGirr, dated March 21, 1914:

"Regarding the $1,800, if you will read your contract, you will notice that $1,300 was the agreed expense incurred in the inspection of the property and $500 was to be used for the purpose of incorporating.

"Regarding the incorporation of the company, it would be a very unwise move to incorporate the company in Colorado and expect to sell a dollar's work of stock in Minnesota. This positively cannot be done, and there is no use entertaining that proposition. The more local people are interested, the better the proposition will be. We have even thought it would be advisable to have the secretary here until the company is fully organized, on account of issuing stock, which would have to be signed by the secretary, as our deal will have to be closed immediately upon this sale; then, when the company is on its feet, to let you or your brother act as secretary from that time on. The same thing would probably be true regarding the treasurer of the company.

"I am glad to note that you are getting along so nicely with the bank connections there, and trust that things will be in such shape that somebody connected with the bank will be glad to act as treasurer a little later.

"Kindly keep us advised as to the progress you are making. We do not feel that a report every five or six weeks keeps us in touch with the proposition, to give us a chance to do much at this end, and in your next letter, I would appreciate it if you would be a little more definite as to the time when you anticipate closing the government contract, as we are ready to go ahead and incorporate as soon as you have things lined up there."

Also the lines from a letter written by the same party to Victor C. McGirr, March 24, 1914:

"Regarding incorporating, I have had the matter up with the others here, and they think that it would be a big mistake if we do not incorporate here, unless we get a chance to deal it on some satisfactory basis."

In a letter dated December 7, 1914, to Mrs. Hattie McGirr, Pagosa Springs, Colo., the Meadow Valley Land Company, by Mason W. Spicer, used the following language:

"We are located so far from the property, and it is so expensive showing it, that we have not thought that we were at liberty to incur the expense neces-

sary in showing this property under the present circumstances, as we are entitled to a deed for a one-half interest and have never been able to secure this."

In a letter to Victor C. McGirr dated December 23, 1914, and signed, "Meadow Valley Land Co., by Mason W. Spicer," the following language is used:

"I think that everybody who entered into this arrangement with you originally intends to go through with the deal, and would be very glad to go through with it now, if you are able to put it through along the lines which you claimed you could. If you could consider a new loan for a long length of time, I am satisfied that we could arrange to complete the negotiations which you were going to consummate last May. If you cannot complete things along this line, we think that you should send us a quitclaim deed to your one-half interest in the land according to our agreement as to our interest."

At the time the last two letters were written, Russell Spicer had already bid in the land at the foreclosure sale. On July 9, 1914, Mason W. Spicer writes to Ross E. McGirr as follows:

"You will recall by our contract that there were a number of matters Victor promised to do, none of which, to our knowledge, has been complied with. You undoubtedly will recall that there is a payment this month or next month of interest on the mortgage. *At the time this mortgage was made, it was expressly understood that some method would be used to meet the interest and to comply with the conditions of the contract.* It seems to me that, if you are unable to secure a loan to take care of the mortgage, as no steps have been taken for the organization of the company along the lines proposed, that this mortgage will have to be foreclosed."

When Mason W. Spicer was called as a witness in this case, he said, among other things:

"All the time, before and after this matter came up, we talked about organizing a corporation; that was McGirr's idea—to secure valuable timber holdings from the government which he could purchase."

The witness was then asked the question:

"Q. How was he to secure these timber lands? A. He owned at this time 2,880 acres of land, over which had been constructed a railroad previously, or a roadbed, and to get at the government timber it was necessary to go across this land. If he could protect his title, he could make the contract; the government was going to lease him the timber at 5 per cent. increase each year for five years. He could secure it on a basis of two or three dollars a thousand. And we started to Denver with this understanding: That, if everything turned out satisfactory, Tallman and my brother would make the loan of $30,000, I would put in the $10,000 mortgage, and if they made this loan, and the thing lined up in the proper kind of shape, Wallace and I were to interest ourselves with McGirr after he had secured the government contract. We talked over the question of incorporation, and agreed to put up $500 with Wallace to pay the expenses of incorporation, and McGirr was to be the attorney and organize the company. * * * As far as the loan was concerned, my brother figured that he could make the loan safely and the mortgage would be paid off, if McGirr secured the government contract and a company was organized and put upon an equitable basis. * * * We finally settled upon a corporation to be determined upon later, and Park drew up Exhibit A–50, which is as follows and which McGirr signed."

The witness further testified as follows:

"Q. What was your brother Russell to have in the proposed company? A. I had never settled on anything definite. We expected to have an interest

in the company, and never had any idea what Wallace or I would do; but we expected to interest people in our share of the company, practical timber people, and eventually I expected I could acquire some of that stock and participate in some of the profits to be made.

"Q. And, in consideration of making the loan, you were to have the $7,500 bonus. all of this expense, and more than one-half interest in the equity in the land; is that true? A. Yes.

"Q. And he was to pay all the expenses out of this money that was borrowed? Then how was the loan to be paid? A. The company was to be organized, McGirr was to get the government timber within six months, and he also talked of an additional 4,000 acres of timber. The land was to be deeded to the corporation, subject to the mortgage; I presume the company was to pay the mortgage."

[2] There is no dispute about the proposition that a corporation was to be formed to which the land in controversy should be conveyed, and the Spicers and whoever was interested at the Minneapolis end was to have one-half of the common stock, and Victor C. McGirr one-half, and that the money advanced and secured by the trust deed should be a first lien on the land in the hands of the corporation. There is a dispute as to who is to blame for the failure to organize the corporation. Upon this point we find that the failure to incorporate a new company was due solely and alone to the refusal by Mason Spicer and Russell Spicer to proceed with the incorporation of the company or to advance money to Victor C. McGirr for the purchase of timber land. We approve of the findings of fact of the trial court as they appear in the record, but we are not satisfied that the decree entered upon such findings can be sustained. The situation of the parties and their acts strongly sustain the view that we have taken upon the facts. When the land was purchased from the Durango Bank and the Securities Company, and the legal title vested in Ross E. McGirr, he held said title in trust for the Spicers and Victor C. McGirr, subject to the lien of the trust deed, which he was to execute to the Spicers as the holders of the legal title. Ross E. McGirr had no interest in the land, as there was no redemption from the bank or the Securities Company, but a direct purchase of their title, which had cut out any lien that Ross E. McGirr had upon the land as trustee in any mortgage given by Victor C. McGirr. Ross E. McGirr did not receive a dollar of the money for which the notes and the trust deed were given by him. Victor C. McGirr only received $2,000, and that the undisputed testimony shows was spent by him in endeavoring to secure other timber land and other necessary expenses connected with the land in controversy. Therefore there is no. reason for saying that Ross E. McGirr intended to pay the notes, or that he was expected to pay the same. Victor C. McGirr signed no notes or trust deed. Ross E. McGirr and Victor C. McGirr had no credit, and the only security for the payment of the notes was the trust deed. Notwithstanding these facts, a trust deed to secure the payment of notes, amounting to $39,500, payable in one year from date, was executed, when it could not have been contemplated by any one that the notes would be paid by Victor C. McGirr or Ross E. McGirr in that time. It is inconceivable that Victor C. McGirr should have gone to all the trouble and expense of raising this money to buy the land from the Durango Bank and pay off other liens upon it, mere-

ly to turn it over to the Spicers, for that was what the transaction would amount to, on the theory that it was simply a loan to him. The trust deed was promptly foreclosed on the first default in the payment of interest. Another fact which sheds light upon the whole transaction is that Mason Spicer, after the land had been bid in at foreclosure sale by Russell Spicer, still wrote to Victor C. McGirr as if the transaction was still as McGirr now claims it to be.

[3] These being the salient facts as contained in the record, can a court of equity afford any relief? It is insisted by counsel for the Investment Company that it was incompetent to show by parol testimony that the debt represented by the trust deed and notes was to be paid by a corporation to be formed and to which the land should be deeded, as such testimony would tend to contradict or vary the terms of the trust deed and notes. When a court of equity may or when it may not receive parol testimony with reference to written instruments is stated in Peugh v. Davis, 96 U. S. 336, 24 L. Ed. 775, as follows:

"It is an established doctrine that a court of equity will treat a deed, absolute in form as a mortgage, when it is executed as security for a loan of money. That court looks beyond the terms of the instrument to the real transaction, and when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties. As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible. The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. Thus it may be shown that a deed was made to defraud creditors, or to give a preference, or to secure a loan, or for any other object not apparent on its face. The object of parties in such cases will be considered by a court of equity; it constitutes a ground for the exercise of its jurisdiction, which will always be asserted to prevent fraud or oppression, and to promote justice. Hughes v. Edwards, 9 Wheat. 489 [6 L. Ed. 142]; Russell v. Southard, 12 How. 139 [13 L. Ed. 927]; Taylor v. Luther, 2 Sumn. 228 [Fed. Cas. 13796]; Pierce v. Robinson, 13 Cal. 116."

The same rule is stated in Brick v. Brick, 98 U. S. 516, 25 L. Ed. 256.

Michels v. Olmstead, 157 U. S. 198, 15 Sup. Ct. 580, 39 L. Ed. 671, was a case where Olmstead brought a bill in equity to enjoin Michels from prosecuting an action at law against Olmstead to recover damages for the breach of a contract in writing by which Michels agreed to furnish and to put into a building to be erected by Olmstead at Kansas City, Mo., the machinery necessary for manufacturing corn into a syrup commonly called "glucose." The bill alleged that before the contract was signed Olmstead informed Michels that he did not desire to engage in the business of manufacturing syrup individually, but only as a member of a corporation which he and others contemplated forming, and as agent for whom he was negotiating, and that Michels promised him that, if he would sign the contract, he would permit him to see the operation of manufacturing syrup from corn by the dry process in the works of Michels at Detroit, Mich., and then return and report to his associates, and if he should be satisfied, and report that the process was in successful operation, and would accomplish the or-

ganization of the corporation, the terms of the contract might be taken as the basis of a proposition by Michels which the corporation might adopt, but that in no event should the contract bind Olmstead individually. The bill further alleged that after the signing of the contract the plaintiff and his associates discovered that the pretended dry process was worthless, and was so known to be by all persons skilled in the manufacture of syrup from corn, and that the price of the machinery mentioned in the contract was excessive and extortionate, and that the plaintiff and his associates did not accept Michel's proposition nor organize a corporation. It was held in this case that evidence to show these facts was admissible in equity to prevent the accomplishment of what any court of chancery must consider and treat as a fraud, citing Burnes v. Scott, 117 U. S. 582, 588, 6 Sup. Ct. 865, 29 L. Ed. 991, Burke v. Dulaney, 153 U. S. 228, 14 Sup. Ct. 816, 38 L. Ed. 698, and Davis v. Wakelee, 156 U. S. 680, 15 Sup. Ct. 555, 39 L. Ed. 578.

Under the facts as they appear in the record, the foreclosure of the trust deed under the circumstances was a fraud upon the McGirrs, and equity, having jurisdiction to grant relief in a case of fraud, may receive evidence, either oral or written, which tends to establish the fraud. Any other position would defeat a great portion of the remedial jurisdiction of a court of equity. It is not sought to impeach the trust deed or the notes, but simply to show the purpose and real nature of the transaction, that justice may be done. Schroeder v. Young, 161 U. S. 334, 16 Sup. Ct. 512, 40 L. Ed. 721. This suit, so far as the affirmative relief asked is concerned, is against the Investment Company, which is charged with full knowledge of the whole transaction.

[4-6] It is further claimed that no relief can be given the McGirrs in their attack upon the foreclosure of the trust deed, because they make no tender of the amount admitted to be due on the notes. A sufficient answer to this contention is that the McGirrs do not admit there is anything due from them on the notes. It is conceded that the trust deed is a valid lien upon the land for the amount of money really advanced thereunder, but it is alleged that the foreclosure of the mortgage under the circumstances was a fraud. It is next insisted that Victor C. McGirr had been guilty of laches, in that he made no defense when the mortgage was being foreclosed, and waited some two or three years before making his claim. In answer to this contention, it is sufficient to say that mere lapse of time never constitutes laches, but in addition the court must find that it would be inequitable to grant the relief prayed for. Schwartz v. Loftus, 216 Fed. 320, 132 C. C. A. 464 (Eighth Circuit), and cases cited.

The Investment Company, being charged with notice of the dealings of all the parties, does not occupy a position which would make the granting of the relief prayed for inequitable as to it. It is not in court with clean hands. The correspondence between the parties almost up to the time of this suit treated the agreement between the parties as still existing notwithstanding the foreclosure.

[7, 8] It is further insisted that Victor C. McGirr is estopped from asking any relief from the foreclosure. There is no element of estoppel in the case. The Investment Company is not an innocent purchas-

er, and there is no evidence that any one ever acted upon anything that McGirr said, and there is no evidence that he ever said anything contrary to what he now says. The pleadings are very crude, but there is a prayer for general relief, and the court having jurisdiction may grant any relief consistent with the pleadings and the evidence. If the pleadings do not conform to the evidence in some respect, they may be amended by the trial court. The agreement between the parties is one that a court of equity would not and could not specifically enforce, but it is a case for equity to treat as having been done that which ought to have been done. It is our opinion that the decree below should be reversed, and the case remanded, with directions to the trial court to enter a decree adjudging that the foreclosure of the trust deed and the conveyances thereunder be set aside; that Victor C. McGirr is the equitable owner of an undivided one-half, and Russell Spicer, Mason Spicer, and Carl Wallace are the equitable owners of an undivided one-half, of the property in controversy; that said land is subject to the lien of the trust deed for such amount as may be shown to be secured thereby; that a receiver be appointed to take possession of the property, with the usual powers; that Ross E. McGirr convey the title of the land to the receiver; that the amount of the lien secured by the trust deed be ascertained; that the land be sold by the receiver according to law and the decree of the court, but without redemption, free from the lien of the trust deed, the lien being transferred by the decree to the proceeds of the sale; that the proceeds of sale, after the payment of expenses of the receivership and other court costs, be applied, first, to the payment of the moneys secured by the trust deed, and, second, to the payment of any sum expended by either party for the protection of the property in controversy although unsecured, the remainder to be paid to Victor C. McGirr and the Spicers and Wallace in equal proportions; that the conveyance from Russell Spicer to the Investment Company be held valid as an equitable assignment of the lien of the trust deed; the trial court to provide in its discretion for the payment of a part of the purchase price by credit on the amount of the lien of the trust deed if the owner of the same shall bid in the land at the receiver's sale; the relief prayed for by plaintiff be denied; and it is so ordered.