## NORTH AMERICAN CO. v. ST. LOUIS & S. F. R. CO. SPILLER v. ST. LOUIS–SAN FRANCISCO RY. CO. SPILLER et al. v. SAME.

(District Court, E. D. Missouri. August 23, 1922.)

No. 4174.

1. **Carriers ☞30—Established rates, while in force, have effect of statute.**

Interstate rate schedules, duly established in accordance with Interstate Commerce Act, § 6, as amended (Comp. St. § 8569), while in force, have the effect of a statute, and if in fact unreasonable the shipper is nevertheless bound to pay, and the carrier to retain, such rates, leaving, however, to the former the right to apply to the Interstate Commerce Commission for reparation.

2. **Carriers ☞31—Established rates can be changed by Commission only by order.**

A report or an opinion of the Interstate Commerce Commission, that existing rates are unreasonable, without an order to change them, neither authorizes nor permits a departure therefrom.

3. **Receivers ☞149—Administration of property in insolvency; order requiring filing of claims.**

In the administration of the property of an insolvent railroad company, it is the customary practice of a court of equity to make an order requiring all persons claiming a right to participate in the property to file their claims by a stated date, and barring claims not so filed from participation in the property being administered, and such orders are necessary, lawful, and effective.

4. **Receivers ☞147—Claims based on reparation order of Interstate Commerce Commission are provable in receivership suit.**

Where the property of a railroad company is in process of administration by a court of equity, in consolidated suits by general creditors and mortgagees, claims of shippers against the company for overcharges, which have been liquidated by an order of reparation made by the Interstate Commerce Commission, are proper claims for filing and allowance by the court of administration.

5. **Receivers ☞149—Claims not filed in receivership suits held barred.**

Where, pending a suit for administration of the property of a railroad company for the benefit of creditors and stockholders, and before expiration of the time fixed by the court for filing claims, claims of shippers for overcharges were liquidated by an order of reparation made by the Interstate Commerce Commission, but no claims based thereon were filed in the suit, and thereafter the property was sold by the court, the purchaser

being required as part of the purchase price to pay the claims allowed against it, holders of such overcharge claims *held* not entitled by intervention, more than four years after the sale, to assert liens on the property sold.

**6. Equity ☜346—Burden is on complainant to avoid laches, where suit is commenced after action at law would be barred.**

If a suit in equity is brought after the time fixed by the analogous statute of limitations for bringing an action at law, the burden is on complainant to plead and prove unusual conditions or extraordinary circumstances, which would make it inequitable to apply the usual rule of following the statute.

**7. Receivers ☜149—Failure to file claim in receivership suit held laches.**

That claimants were prosecuting their claims before the Interstate Commerce Commission, and later before the courts, to obtain judgments against a railroad company for reparations, pending a suit to administer the property of the company for creditors, does not excuse their failure to file their claims in such suit, as required by an order of the court, which had jurisdiction, at least after an order of reparation by the Commission had liquidated the claims, to consider and allow the same against the property in its hands.

**8. Receivers ☜149—Publication of order for filing claims sufficient notice.**

Where a court of equity is administering the property of a railroad company, of which it has exclusive possession, through its receivers, publication of its order fixing the time for filing claims, and barring claims not filed from participation, constitutes regular and binding notice thereof, and further notice or knowledge is not indispensable to bar a claim.

**9. Receivers ☜149—Creditors bound to take notice of usual procedure in receivership suit, as to filing of claims.**

One having a claim against a railroad company, who has knowledge that its property is in the exclusive possession of a court of equity for administration in behalf of creditors, is bound to take notice that in the usual course of such administration the court will make and publish an order for filing of claims, and to keep himself informed as to the same.

**10. Railroads ☜194(8)—Notice of claim against property after sale held ineffective to avoid laches.**

Notice of a claim against the property of a railroad company, given to the parties and the purchaser on the day a sale of the property in foreclosure proceedings was confirmed by the court, where no action of the court was invoked until more than four years later, *held* not to avoid the consequences of laches in failing to file the claim within the time fixed by an interlocutory order in the suit.

**11. Receivers ☜149—Final decree held not to extend time for filing claims; "arise."**

A provision in a final decree foreclosing liens on the property of a railroad company for payment of claims that might "arise" after the decree *held* not to include claims which accrued before the decree, and which, though they might have been, were not, filed in the suit, and the time fixed by an interlocutory decree for filing claims, and barring claims not so filed, had expired.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Arise—Arising.]

**12. Railroads ☜30—Sale of property to reorganized company held valid as against holders of claims not filed in foreclosure suit.**

Holders of claims against a railroad company, whose property was in process of administration by a court, who did not file their claims in the suit as required of all claimants to an interest in the property by an interlocutory decree, *held* to have no standing to attack the validity of a sale to a reorganized company, because they were not offered cash or a

beneficial interest in the new company, as were those whose claims were filed and allowed.

13. Equity ⬤⟿114—Interveners are bound by prior orders and decrees in the suit.

Those who intervene in a suit in equity on their own application enter subject to, and are thenceforth bound and estopped by, all the previous orders, decrees, and acts of the court in the suit to the same extent as they would have been if they had been parties to the suit when those orders or decrees were made.

14. Railroads ⬤⟿192—Interveners in suit after sale of property conclusively estopped to attack validity of sale.

Interveners in a suit in which the property of a railroad company was administered and sold, who came in four years after final decree and sale, *held* conclusively estopped from assailing the validity of the decree or sale, or the title of the purchasing company, whose stock had been sold to the public in the meantime.

15. Railroads ⬤⟿194(6)—Defense of suit by receivers does not render them nor purchasers liable for judgment for attorney's fees.

The fact that a suit against a railroad company was defended by its receivers, who were not parties, does not render them liable for attorney's fees awarded against the company in the suit, nor does it impose such liability on a purchaser of the railroad property prior to the judgment.

16. Trusts ⬤⟿365(5)—Suit to enforce trust barred by laches.

Delay of six years after the right of action accrued before bringing suit to enforce a trust ex maleficio, during which time all the property of the alleged trustee charged with the trust had been administered by a court of equity and had passed into other hands, *held* such laches as to bar relief.

17. Carriers ⬤⟿198—Excessive rates collected, if in conformity to tariff schedule, are not held as trustee ex maleficio.

The collection by a railroad company of rates in accordance with its established schedule is not unlawful, though. the Interstate Commerce Commission may afterward adjudge such rates to be unreasonable and excessive, and order reparation to shippers, and the company is not chargeable with holding the excess rates so collected as a trustee ex maleficio.

18. Carriers ⬤⟿202—Statutory remedy for recovery of excessive charges exclusive.

The remedy for recovery of excessive charges collected by a railroad company provided by Interstate Commerce Act, §§ 8, 10 (Comp. St. §§ 8572, 8574), by obtaining an order of reparation from the Interstate Commerce Commission and bringing suit for its enforcement, is exclusive, and a shipper cannot maintain a suit to charge the company as trustee ex maleficio of such excess.

19. Carriers ⬤⟿202—Shippers cannot invoke inconsistent remedies for overcharges.

Shippers, who have pursued the statutory remedy for recovery of overcharges collected by a railroad company, by obtaining from the Interstate Commerce Commission an order awarding them damages, and a judgment on such order, cannot later maintain a suit to charge the company as trustee, on the inconsistent theory that ownership of the money collected remained in them.

20. Receivers ⬤⟿160—Only claims for operating expenses within six months may be preferred over recorded liens.

To entitle an unsecured creditor to priority of payment over the claims of bondholders or other prior recorded liens from the property of a railroad company administered in equity, it is indispensable that his claim should be for current expenses of ordinary operation, incurred in the ordinary course of business within six months before the impounding of the property.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**21. Receivers** ⟝160—**Claims for overcharges to shippers held not entitled to priority over recorded liens.**

Claims against a railroad company for overcharges collected more than five years before the property of the company was impounded for administration by a court of equity *held* not within the class of claims which may be given priority over recorded liens.

In Equity. Suits by the North American Company and by the Rail Joint Company against the St. Louis & San Francisco Railroad Company, consolidated. In the matter of interventions of E. B. Spiller and of E. B. Spiller and others against the St. Louis-San Francisco Railway Company, purchaser at foreclosure sale. Intervening petitions dismissed.

W. F. Evans and E. T. Miller, both of St. Louis, Mo., for exceptors.

S. H. Cowan, of Fort Worth, Tex., D. A. Murphy, of Kansas City, Mo., and John S. Leahy and Walter H. Saunders, both of St. Louis, Mo., for interveners.

SANBORN, Circuit Judge. Between August 16, 1906, and November 17, 1908, the St. Louis & San Francisco Railroad Company collected of certain shippers of cattle, whose claims are held by the interveners, legally established freight rates, which on April 14, 1908, the Interstate Commerce Commission found to be unreasonable and unjust to the extent of about 3 cents per 100 pounds. That Commission then held reasonable rates to be those in force prior to 1903, and by its order, made in July, 1908, the earlier rates were put in force November 17, 1908. The Commission reserved all questions of reparation, and on January 12, 1914, after a new hearing on the merits, ordered the railroad company to pay in reparation of the damages for the collection of the excessive charges about $30,000, interest, attorney's fees, and costs. For convenience in the treatment of this controversy the amount will be hereafter stated as $30,000, although that is not the exact amount.

In May, 1913, on the bill of the North American Company, a general creditor of the railroad company, brought for itself and all others of its class, this court appointed receivers of all the property of the railroad company for the benefit of all its creditors as their interests might appear; the receivers took possession of all its property and proceeded to operate it, and to distribute the proceeds thereof to its creditors. On April 3, 1914, the Rail Joint Company, a general creditor, filed a like bill, and that suit was consolidated with the suit of the North American Company under the title of "North American Company, Complainant, v. St. Louis & San Francisco Railroad Company, Defendant, in Equity, No. 4174, Consolidated Cause." On May 29, 1914, in this consolidated cause, this court rendered an interlocutory decree to the effect that all the property of the railroad company was thereby impounded, sequestered, and set apart to pay the debts and obligations of the railroad company, that all parties who claimed any interest in or lien upon any of the property of the railroad company in the hands or control of the receivers should file verified state-

⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ments of their claims with the special master on or before October 1, 1914, and that each of them who failed or refused so to do should, by such failure, be barred from receiving any share in the distribution of any of said funds of the property or of the proceeds thereof. Notice of this order and of the limitation of the time for the presentation of claims, in order to permit the holders thereof to derive any benefit from or share in the distribution of the property in the hands of the receivers or of its proceeds, was ordered to be and was duly given by a proper publication of the order itself. By subsequent orders this court extended the time for the presentation of such claims, until the necessity to know definitely the number and amount thereof as a basis for the bids of prospective purchasers at the approaching foreclosure sale who were to assume the payment of such claims, and as a basis for correct estimates of the amounts which various classes of creditors might expect to receive from the disposition of the property in the hands of the receivers became imperative, and that time finally expired on February 1, 1916.

On May 22, 1914, the trustees, under the general lien mortgage of the railroad company dated August 27, 1907, filed their bill for its foreclosure. On July 9, 1914, the trustee of the railroad company's refunding mortgage dated June 20, 1901, filed his bill for the foreclosure of that mortgage. The court appointed the same receivers that had been appointed in the previous suits, who immediately took possession of and impounded all the mortgaged property for the benefit of the mortgage bond holders, and by prior orders and by an order of January 21, 1916, all the suits that have been mentioned were consolidated into the single suit entitled "North American Company, Complainant, v. St. Louis & San Francisco Railroad Company, Defendant, No. 4174, Consolidated Cause, Final," and the final decree of foreclosure and sale was rendered in this consolidated cause and in each of its constituent causes. Substantially all the property of the railroad company was subject to the mortgages which were thereby fore-. closed.

On March 31, 1916, the final decree of foreclosure and sale of all the property of the railroad company was rendered. On July 16, 1916, all this property was sold under that decree to purchasers for the St. Louis-San Francisco Railway Company, which subsequently assumed their obligations, received the property, and will hereafter be deemed and called the purchaser. On August 29, 1916, this court, after an extended hearing upon notice to all parties in interest, confirmed this sale.

The interveners had not filed any claim to any interest in or lien upon the property or the proceeds of the property of the railroad company which had come to the hands of the receivers, with the master or with the court, prior to the expiration of the time fixed for the filing of such claims on February 1, 1916, nor did they ever file any verified claims of that nature prior to the time when they filed their intervening petition herein on December 2, 1920; but at the hearing on the application for the confirmation of the sale on August 29, 1916, they gave notice to the parties to the consolidated cause that they had

claims against the railroad company for illegal freight exactions that had been reduced to the judgment in the United States District Court for the Western District of Missouri of August 16, 1916, that appeal was being taken from that judgment by the railroad company and other carriers, and that the interveners would claim that their claims evidenced by that judgment were prior in lien and superior in equity to the liens and claims of every other party whomsoever upon and to the property of the railroad company in the hands of the receivers. No other or further suggestion, presentation, or action was made or taken by the interveners to present or prove their claims on or to the property sold and delivered to the purchaser, the railway company, under the foreclosure decree or against the railway company until December 2, 1920, when they applied to this court for leave to file their intervening petitions in this consolidated cause.    The railroad company and the railway company opposed that application.

On February 12, 1921, this court granted the application.  As was stated in its memorandum, it was not then persuaded that the interveners were not entitled to present their pleadings and evidence, and it was of the opinion that the claims of the interveners would more speedily reach a final and satisfactory adjudication by permitting them to plead and prove them than by refusing so to do.  The court intended, by its order permitting the filing of the intervening petitions, as the special master rightly ruled, thereby to permit pleadings and proofs on the merits on all the issues raised by the interveners' petitions.  It did not, however, intend by that order to determine, and did not determine, what the master's or the court's final adjudication should be or ought to be, on any of the issues presented after the answers of the railroad company and the railway company and the evidence of all the parties should be before them.

[1] In the year 1903 the railroad company advanced its freight rates on shipments of cattle from the Southwest to Kansas City, Chicago, and other markets about 3 cents per 100 pounds, filed and published the schedules of the advanced rates, and otherwise complied with the requirements of the Act to Regulate Commerce, so that these advanced rates became in 1903, and until November 17, 1908, when, by the order of the Commission, based on its finding and opinion of April 14, 1908 (Cattle Raiser's Association v. Missouri, Kansas & Texas Railway, 13 Interst. Com. Com'n R. 418, 435) the reduced rates in existence prior to 1903 were again put in force, continued to be, the legal established rates, and the only rates which the railroad company could collect or receive without violating the act and subjecting itself to the heavy penalties prescribed for such violations. Act to Regulate Commerce, §§ 2, 6, 10 (United States Compiled Stat. §§ 8564, 8569, 8574); Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 436, 437, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075.  "The tariff, so long as it was of force, was, in this respect, to be treated as though it had been a statute, binding as such upon railroad and shipper alike.  If, as a fact, the rates were unreasonable the shipper was nevertheless bound to pay and the carrier to retain what had been paid, leaving, however, to the former the right to apply to the Commission for reparation."  Penn. R. R. Co. v. International Coal

Co., 230 U. S. 184, 197, 33 Sup. Ct. 893, 896 (57 L. Ed. 1446, Ann. Cas. 1915A, 315); Robinson v. B. & O. Ry. Co., 222 U. S. 506, 509, 32 Sup. Ct. 114, 56 L. Ed. 288.

[2] The railroad company and the other carriers engaged in transporting cattle from the Southwest strenuously contested the claims of the shippers that the advanced rates were unreasonable, and that the shippers were entitled to the damages as reparation for the loss sustained by their collection, and, after the receivers were appointed, they, under the name of the railroad company, continued this contest until it was finally decided by the Supreme Court of the United States. On February 10, 1904, the Cattle Raisers' Association of Texas, for the benefit of the interveners and other shippers, filed with the Interstate Commerce Commission a complaint that these, advanced rates were unreasonable and unjust. The carriers denied that they were so, and on August 16, 1905, the Commission filed its report and opinion to the effect that the rates were unjust and unreasonable to the extent of the advances made in 1903. Cattle Raisers' Association v. Missouri, Kansas & Texas Railway, 11 Interst. Com. Com'n R. 296, 352. But it reserved all questions of reparation, and it made no order on this report and finding, so that the advanced rates still remained the legal and only freight rates which the railroad company could collect without a violation of the Act to Regulate Commerce. A report or an opinion of the Interstate Commerce Commission without an order to change established rates neither authorizes nor permits a departure therefrom.

On August 29, 1906, the Cattle Raisers' Association applied to the Commission to reopen this case; the Commission granted its application, set the case for a second hearing, and tried it again. This trial resulted in the report and opinion of April 14, 1908, and the order of July, 1908, which put the rates prior to the advances of 1903 in force on November 17, 1908; but the Commission reserved questions of reparations to be dealt with as specific claims were presented. The interveners presented their claims for reparation to the Commission, and on January 12, 1914, it ordered the railroad company to pay to the interveners as damages resulting from the collection of the advanced rates the $30,000 it had obtained in excess of the rates prior to the advances of 1903 between August 16, 1906, and November 17, 1908. On December 29, 1914, the interveners brought an action at law in the United States District Court for the Western District of Missouri upon the Commission's award of damages and orders of reparation, and on August 16, 1916, they recovered judgments against the railroad company for the $30,000 interest and attorney's fees. One of these judgments was subsequently reversed by the Court of Appeals, but was finally affirmed by the Supreme Court on May 27, 1920, and by stipulation of the parties the other judgment thereafter stood firm.

[3] In May, 1913, this court appointed receivers of and took into its exclusive possession and control all the property of the railroad company, for the purpose of administering, selling, and distributing it and its proceeds to the creditors and stockholders of the company in accordance with the respective ranks and equities of their claims

upon and to it. It is indispensable to the just administration and distribution of such property that the court shall be advised and know, as far as possible, before it proceeds to adjudge the equities of the parties interested in it, or to sell it or distribute its proceeds, the claimants who seek to participate in it and the nature and extent of their claims. Such knowledge is necessary to enable the court to reach a basis for action in determining the equities of claims, the propriety of sales, the probable value of various claims, and the propriety of settlements and compromises thereof. In order to secure this information it has long been the lawful and approved practice of the courts of equity and probate, engaged in the administration and distribution of such property to render interlocutory decrees or orders to the effect that all who desire or intend to seek to participate in such property or the benefits therefrom shall file their verified statements of the amounts and natures of their claims on, in, or to the property or its proceeds by certain times, and that all who fail to file such claims before the expiration of such times shall be thereby barred and foreclosed from any lien upon or interest in the property in the hands of the court or its proceeds.

Such orders are primarily and chiefly for the assistance and benefit of the court in the discharge of its duties of administration and distribution, although they are also beneficial to claimants, and especially to those who desire to bid for the purchase of the property; and, as the latter are frequently required to pay some or all of such claims as a part of the purchase price of the property, they are warranted in relying upon the statements thus filed and the interlocutory and final decrees of the courts barring those claimants from participation who do not present such verified statements within the times fixed. Such an interlocutory decree was rendered in this suit, which, by its express terms, foreclosed and barred the interveners in this case from all liens upon and interests in the property of the railroad company or its proceeds, because they had failed to file any verified statements of claims thereon or thereto on or before February 1, 1916. Such decrees and orders are lawful, customary, and effective. Farmers' Loan & Trust Co. v. Chicago & N. P. Ry. Co. (C. C.) 118 Fed. 204, 205; Western New York & P. R. Co. v. Penn Refining Co., 137 Fed. 343, 367, 70 C. C. A. 23.

[4] The actions at law which the interveners were prosecuting against the railroad company in the United States District Court at Kansas City and in the Supreme Court gave no notice to this court, and it had no knowledge whether or not the interveners claimed any lien upon or interest in the property of that company in its possession, except that information which it derived from the fact that they had not filed such verified claims, although their claims against the railroad company had been established as to the liability of the railroad company and as to their amounts by the reparation orders of the Interstate Commerce Commission of January 12, 1914, and the interveners could have filed their verified claims for participation in the benefits of the property in the hands of this court at any time after January 12, 1914, and before February 1, 1916. Not only this, but this court had plenary jurisdiction, upon proper application, to have heard and

decided their claims for participation in the benefits of this property whether those claims were founded on causes of action at law or in equity.

[5] They filed no claims, and on March 31, 1916, the final decree herein expressly adjudged the claims of all who had neither intervened nor filed verified claims foreclosed and barred of participation in the benefits of the property or its proceeds as against all parties claiming under that decree. On July 16, 1916, in reliance upon these decrees, the railway company purchased all the property at the foreclosure sale. Then and thereby the court contracted to convey that property to the purchaser for the purchase price it bid for that property, free from the claims of the interveners, as it had decreed that it was, and the purchaser contracted to pay the purchase price it bid therefor. The court and the purchaser performed this contract. On August 29, 1916, the court confirmed the sale. A few days later it caused the property to be conveyed to the purchaser. The purchaser paid the price it had bid for it, issued its stock and bonds to the amount of hundreds of thousands of dollars, and immediately placed them upon the market, so that many of them must have gone into the hands of innocent purchasers long before the interveners on December 2, 1920, applied for leave to file their intervening petitions.

What, then, do the interveners now claim and seek? After failing to file their verified claims, as ordered by the interlocutory decree, from May 29, 1914, until after the time so to do expired on February 1, 1916, after neglecting to make any motion, file any petition or application to this court, or to take any other effectual step to question or avoid the decrees of the court, or the sale and disposition of the property under them, or the effect of their long delay and inaction until they applied to file their intervening petitions, more than six years and eight months after the liability of the railroad company to them and the amounts of their claims had been fixed and directed by the reparation orders of the Commission to be paid by the railroad company, and more than four years after the contract of the court to sell the property was made on July 16, 1916, the sale confirmed, the property delivered to the purchaser, the property paid for by the purchaser, the stocks and bonds of the purchaser issued, and many of them doubtless sold to innocent purchasers, the interveners appeal to this court of equity to disregard its contract of sale, its interlocutory and final decrees, and compel the purchaser to pay for the property it bought in reliance upon the silence and inaction of the interveners and the adjudication of those decrees $30,000, interest thereon for many years, and attorney's fees, in addition to the amount for which the court by its decrees and contract of sale agreed to sell and convey, and did sell and convey, this property to the St. Louis-San Francisco Railway Company. But—

"Where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect." Penn Mutual Life Insurance Co. v. Austin, 168 U. S. 696, 698, 18 Sup. Ct. 223, 228 (42 L. Ed. 626).

Since the interveners neglected to file their verified claims, and those claims became barred by the interlocutory decree and the final decree, the rights of the purchaser under its contract of purchase and deed and the rights of each of its stockholders and creditors have intervened in just reliance upon that neglect and the decrees of the court, and the granting of the relief which the interveners now seek will impair those rights to the amount in the aggregate of this $30,000, interest, and attorney's fees.

The statute of limitations of the state of Missouri, applicable to the cause of action at law analogous to that which the interveners here present is five years from the date of its accrual. 1 Rev. Statutes of Missouri 1909, §§ 1887, 1889. The limitation of the analogous action at law prescribed by the Act to Regulate Commerce is two years. 8 U. S. Comp. Stat. § 8584. The cause of action which the interveners are now most seriously urging is based upon the propositions that the moneys collected from the excessive rates prior to November 17, 1908, were unlawfully exacted from them by the railroad company, that the railroad company consequently became a trustee ex maleficio of those moneys, that the railroad company, until the receivers were appointed in May, 1913, and the receivers thereafter, always had sufficient moneys to pay back the moneys the railroad company thus exacted, and that the purchaser at the foreclosure sale took the property he bought subject to the trust ex maleficio, subject to which the railroad company took the moneys collected in 1908. If this theory is maintainable, the cause of action based upon it accrued when the railroad company collected the moneys prior to November 17, 1908. 39 Cyc. 176; Wheeler v. Reynolds, 66 N. Y. 227, 235; Grove v. Kase, 195 Pa. 325, 45 Atl. 1054. And neither that theory nor any claim or suggestion of it, so far as the court can discover, was ever made by the interveners in or out of the proceedings in this court, or in any other court, until December 2, 1920, when the intervening petitions were presented, more than twelve years after the cause of action to enforce this alleged trust accrued, more than six years and nine months after the Commission's orders of reparation had liquidated and fixed the amounts of the interveners' claims, the liability of the railroad company for them, and had directed that company to pay them.

[6] In the application of the doctrine of laches the settled rule is that courts of equity ordinarily act or refuse to act in analogy to the statute of limitations relating to actions at law of like character. Generally a suit or an application for relief in a court of equity will not be stayed for laches before the expiration of the time, and will be stayed after the expiration of the time fixed by the analogous statute of limitations at law. When such a suit or application is brought within the time of the analogous statute of limitations, the burden is upon the defendant to show that it would be inequitable to permit it to be maintained on account of unusual circumstances, such as innocent purchasers to be affected and radical changes in the relations and interests of the parties meanwhile. On the other hand, if such a suit or application is brought after the time fixed by the analogous statute

of limitations at law, the burden is upon the complainant or petitioner to plead and prove unusual conditions or extraordinary circumstances, which make it inequitable to apply the settled rule and stay the proceedings, notwithstanding the fact that the analogous limitation expired before this suit or application was brought. This case falls in the latter class. The times of the statutory limitations of the analogous actions at law had all expired long before the petitioners presented their applications for intervention, and their petitions ought to be dismissed under the settled rule, unless by pleading and proof they have established preponderant equitable reasons why they should be exempted from its operation. Kelley v. Boettcher, 85 Fed. 55, 62, 29 C. C. A. 14; Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 Fed. 137, 149, 53 C. C. A. 341.

[7] They urge that from 1904 until April, 1914, they were prosecuting their claims before the Interstate Commerce Commission, and thereafter before the United States District Court at Kansas City and the Supreme Court until December, 1920, and that the railroad company and the receivers were defending against these claims. But all those proceedings were against the railroad company for personal judgment against it for damages. The Commission and the courts in which those proceedings were taken had no jurisdiction of the administration and distribution of the property of the railroad company, of which this court had exclusive control after May, 1913. This court also had jurisdiction on proper applications by the interveners, certainly after the orders of reparation of April, 1914, were made, fixing the amounts of their claims and the liability of the railroad company, and perhaps before that time, to receive, hear, and allow or disallow their claims upon or to the property or the proceeds of it in its possession, whether those claims were based on causes of action at law or in equity.

They say that the delay of Boyd in Northern Pacific Railway v. Boyd, 228 U. S. 482, 507, 33 Sup. Ct. 554, 57 L. Ed. 931, was much longer than their delay in the case at bar; but in that case it was indispensable to the maintenance of Boyd's suit in equity that he should first secure a judgment in his action at law. Here no judgment was necessary. All that the interlocutory decree required of the interveners was to file verified statements of their claims, not to prove them, before February 1, 1916. The pending proceedings at law in other courts against the railroad company presented neither impediment to their compliance with that decree nor excuse for their failure so to do.

[8, 9] They insist, and it is conceded, that they had no actual notice or knowledge of the interlocutory decree and its limitation of the time to file claims until August 29, 1916, the day of the confirmation of the sale. But in cases of the administration and distribution of property in the exclusive possession and control of courts of equity and probate courts, reasonable publication of their orders limiting the times to file claims, and barring the claims of those who do not file within the times fixed to participate in the benefits of such property or its proceeds, constitute regular and binding notice thereof, and

further notice or knowledge is not indispensable to bar the claims. Again:

"If a person be ignorant of his interest in a certain transaction, no negligence is imputable to him for failing to inform himself of his rights; but if he is aware of his interest, and knows that proceedings are pending, the result of which may be prejudicial to such interests, he is bound to look into such proceedings so far as to see that no action is taken to his detriment." Foster v. Mansfield, Coldwater & Lake Michigan R. R. Co., 146 U. S. 88, 100, 13 Sup. Ct. 28, 36 L. Ed. 899.

The counsel for interveners knew soon after May, 1913, that all the property of the railroad company had been delivered to the possession and control of this court for administration and distribution, and that the railroad company had none of it. They knew that in cases of this character the common, lawful, and effective practice of courts of equity was to make and publish by advertisement in the newspapers decrees or orders limiting the times to present claims to such courts to participate in the benefits of the administration and distribution of the property, and by such orders or decrees to bar from participation therein the claims of all those who failed to file statements of them within the time fixed. By an examination of the record of this court at any time between May 29, 1914, and February 1, 1916, the interveners or their counsel could have learned of the interlocutory decree and its effect. Notice of facts and circumstances which would put a man of ordinary prudence and intelligence on inquiry is, in law and in equity, notice of all the facts a reasonably intelligent inquiry would disclose. Wood v. Carpenter, 101 U. S. 135, 137, 141, 25 L. Ed. 807. The interveners' notice of the exclusive possession and control by this court, by its receivers, of all the property of their debtor for the purpose of administration and distribution, was sufficient to put a claimant of ordinary prudence on inquiry as to the course requisite for him to pursue to share therein, and such an inquiry would have disclosed, as it did disclose to hundreds of other claimants, the limitation and bar of the interlocutory decree. If the interveners failed to exercise like prudence and diligence, that fact does not appeal with sufficient force to induce a court of equity to relieve them of the injurious effect of that neglect, by imposing it upon the diligent claimants who complied with the decree of the court and their successors in interest.

[10] Interveners invoke the fact that on August 29, 1916, the day of the confirmation of the sale, after the interlocutory decree, after the final decree, and after the contract of sale had been made, they gave notice to the parties to this suit and to the purchaser that they claimed and intended to enforce their claim that they had liens upon the property sold to the purchaser prior in right and superior in equity to those of any and all parties whomsoever. It may be that, if they had then filed a dependent bill, or, as was done in the Boyd Case, an original bill (Northern Pacific Ry. v. Boyd, 228 U. S. 482, 492, 33 Sup. Ct. 554, 57 L. Ed. 931), or if they had then procured an insertion in the final decree of such an exemption of themselves and their claims from the estoppels thereof as the Guardian Trust Company secured in Central Improvement Co. v. Cambria Steel Co., 201 Fed.

811, 815, 120 C. C. A. 121, and Kansas City Southern Railway Co. v. Guardian Trust Co., 240 U. S. 166, 174, 36 Sup. Ct. 334, 60 L. Ed. 579, they might possibly have escaped those estoppels and the fatal consequences of their laches. But they made no motion or application, and took no action to secure any relief from those decrees, or to stay the continuance of their negligence until December 2, 1920, more than four years thereafter. If the owner of an overdue promissory note notifies its maker that he has a right of action, and that he will enforce that right against that maker to the payment by him of that note, such a notice will not stay the running of the statutes of limitations against such an action to secure such a result. An actual commencement of the action is indispensable, and the interveners' notice of August 29, 1916, that they claimed and would enforce rights to liens upon or interests in the property prior in right and superior in equity to those of all others whomsoever, was equally futile to destroy, stay, or exclude the estoppel effected by their laches. "The mere assertion of a claim, unaccompanied with any act to give effect to the asserted right, could not avail to keep alive a right which would otherwise be precluded because of laches." Mackall v. Casilear, 137 U. S. 556, 567, 11 Sup. Ct. 178, 182 (34 L. Ed. 776); Penn Mutual Life Insurance Co. v. Austin, 168 U. S. 687, 697, 18 Sup. Ct. 223, 42 L. Ed. 626.

They say that a court of equity has the power to permit the filing of claims in a receivership suit after the time fixed by the interlocutory decree or order has expired, and in Park v. New York, L. E. & W. Ry. (C. C.) 140 Fed. 799, and in Re Ziegler, 98 App. Div. 117, 90 N. Y. Supp. 683, in which sufficient parts of trust funds remained in the hands of the courts to pay certain cestuis que trust the shares to which they were entitled, and no injury would result from such payments to others, the courts, upon good excuses, one of which was infancy, allowed them to come in after the times and obtain their shares. But this is no such case. There are and were no trust funds from this property in the hands of this court to pay the interveners' claims on December 2, 1920. The funds secured from the sale had been distributed; the property they seek to charge had been sold and conveyed to the purchaser by the court; the purchaser had paid for it. Its stocks and bonds had gone upon the market under two decrees which barred the interveners' claims more than four years before the interveners applied for leave to assail them, and they present no reasonable excuse for these delays.

It is claimed and conceded that the final decree in article 10, paragraph (b), required the receivers in not more than twenty nor less than ten days prior to the day of sale, July 16, 1916, to file a statement of all unpaid indebtedness and liabilities of the railroad company incurred prior to the appointment of the receivers, "and which, so far as they are informed, are claimed to be prior in lien or superior in equity to the refunding mortgage," and the receivers did not include the claims of the interveners in the list they filed. But prior to that time the interveners had failed to file their claims by February 1, 1916, and those claims had been adjudged by the interlocutory decree and

by the final decree of March 31, 1916, to be finally barred, so that it was not the duty of the receivers to list them, and their failure so to do was the natural and direct effect of the negligence of the interveners.

Another alleged excuse for their laches is that the general creditors of the railroad company received offers of settlement pursuant to the terms of the final decree before the confirmation of the sale, and no such offers were made to the interveners. But if they had filed their verified lists of their claims pursuant to the terms of the interlocutory decree they would have received such offers. Their failure to receive them was the natural and direct effect of their failure to comply with the terms of the interlocutory decree, and was but another evidence of their lack of diligence.

[11] Counsel for the interveners claim, and the special master found, that the final decree contemplated that such claims as theirs might be filed and presented to this court after the entry of the decree. The provisions of the decree which condition the correctness of this contention are article 9b, that the purchaser at the sale shall pay "any unpaid claims of creditors of the defendant railroad company which have been or shall be admitted by the parties in interest or adjudged by this court to be prior in lien or superior in equity to the refunding mortgage or the general lien mortgage"; article 10, that the receiver shall, before the sale, file a statement of—

(b) "All unpaid indebtedness and liabilities of the railroad company that they are informed are claimed to be prior in lien or superior in equity to the refunding mortgage. * * * (e) All claims and demands against the defendant railroad company which have been filed in this court pursuant to the orders heretofore entered herein save such as shall have been paid in full. * * * Notice having been given for the presentation in this cause of claims and demands against the defendant railroad company of every character and description whatsoever, and the time for the presentation of said claims having expired, no claim or demand which has not been presented in this cause in accordance with the orders heretofore made requiring presentation thereof other than (1) * * *; (2) any claim that may arise after the entry of this decree, shall be enforced against the receivers or against the property sold or any part or portion thereof, or against any purchaser of the same or any part thereof, his successors or assigns."

The view of the special master was that the word "arise" in the exception, "other than any claim that may arise after the entry of this decree," did not mean "accrue," and that, while the claims of the interveners did not accrue after the entry of the decree, they arose thereafter, and hence were excepted from what seems to the court to be the plain and comprehensive bar of all claims not presented as required by the interlocutory decree contained in that decree and in the final decree. But after thoughtful consideration the court is unable to adopt this view, or to resist the conclusion that the meaning of the word "arise" in the connection in which it is here used was identical with the meaning of the word "accrue"—that none of the claims of the interveners either arose or accrued after the entry of the decree, and that they all fall under the ban of both decrees.

[12, 13] Another contention of the interveners, which the special master adopted, was that the foreclosure decree, the sale thereunder,

288 F.—40

and the confirmation were, between the interveners, on the one hand, and the purchaser and those claiming under it, on the other, "without form and void," and that the interveners could in this proceeding avoid or disregard them and subject the property sold to the purchaser to the payment of their claims under the rule in Northern Pacific Railway Co. v. Boyd, 228 U. S. 483, 33 Sup. Ct. 554, 57 L. Ed. 931. But the reorganized corporation which purchased the property in this case, its rights to the property, the final decree itself, the sale and confirmation thereof thereunder, and the estoppels effected thereby, are free from the vice that rendered the decree and sale in Boyd's Case voidable or void as to him. That vice was that the real purchaser at the sale was the reorganized corporation, in which the stockholders of the mortgagor were given beneficial interests for their stock, while the unsecured creditors were excluded from any such benefits. In the course of the foreclosure proceedings in this case, which resulted in vesting the title to the property in the purchaser at the foreclosure sale, a fair and reasonable offer of cash or a beneficial interest in the purchaser corporation was offered to every creditor who filed the verified statement of his claim as required by the interlocutory decree, and more than 90 per cent. of the unsecured creditors accepted that offer. The validity and conclusiveness of that final decree against those who refused to accept the offer or disregarded it has been repeatedly adjudged by this court. Its opinion in the case of McElvain, who filed his verified claim and then failed to accept the offer (St. Louis-San Francisco Railroad Co. v. McElvain [D. C.] 253 Fed. 123, 129, 130, 133, 135), discloses the reasons for those adjudications. If the interveners had filed verified lists of their claims as directed by the interlocutory decree, they would have undoubtedly received fair offers of beneficial interests in the purchasing corporation or of cash. They failed to file such lists as required by the decree of the court, and are consequently in a much less favorable position to assail, avoid, or disregard the estoppels of the decree and of the sale than was McElvain, and for the reasons stated in his case they are, in the opinion of the court, subject to those estoppels.

[14] There is another reason, not less persuasive, why they are estopped from disregarding, avoiding, or assailing the validity of the decrees or the sale in this case. They are here on an order of this court made at their request, which permits them to intervene in this case, more than four years after these decrees and that sale were made. They do not come here on an original bill, as did Boyd, or under an express exemption of themselves and their claims from the estoppels of the decree inserted in the body thereof before it was made, as did the Guaranty Trust Company. They voluntarily intervened in this case more than four years after the decree and the sale, and after, during those four years, many innocent purchasers must have become financially interested in the stock and bonds of the purchaser, and all the relations of the interested parties had radically changed in reliance upon the validity of the decrees and the sale. It is the established and general rule that those who intervene in a suit in equity on their own applications enter subject to and are thence-

forth bound and estopped by all the previous orders, decrees, and acts of the court in the suit to the same extent as they would have been if they had been parties to the suit when those orders, decrees, and acts were respectively made, and under this rule the interveners are conclusively estopped from avoiding, disregarding, or assailing the decrees, the sale, the estoppels thereof, or the title to the property in the purchaser. Swift v. Black Panther Oil & Gas Co., 244 Fed. 20, 29, 156 C. C. A. 448.

All other findings and conclusions of the master and all the contentions of the interveners concerning this question of laches and estoppel have been carefully considered; but they have only confirmed the conclusion which those which have been discussed, and the facts which have been recited, have converged with compelling power to force upon the court.

Under the general rule that the doctrine of laches is applied in accordance with the statutory limitation of the analogous action at law, the interveners were estopped by their laches to maintain this intervention. The liability of the railroad company for and the amounts of their claims were adjudicated and fixed by the orders of reparation of the Interstate Commerce Commission in April, 1914. The interveners could have presented their claims at any time from April, 1914, until February 1, 1916, to this court, which had plenary and exclusive jurisdiction to hear and adjudge their claims of rights to participate in the benefits of the property in its possession. They were ordered and decreed by the interlocutory decree to present those claims to the court by February 1, 1916, or to be barred from enforcing them against that property or its proceeds. They were estopped from enforcing those claims by means of this intervention, because they failed to obey the decree of the court to file with it verified statements of their claims by February 1, 1916, because they never filed with or presented them to this court until December 2, 1920, when they filed this petition to intervene, more than six years after every impediment to their presentation of them to this court had been removed by the reparation orders of 1914, and because, meanwhile, in reliance upon their failure to file their claims to participate in the benefits of the property, this court had rendered its final decree barring their claims, had made the foreclosure sale, had contracted to sell and convey the property free from their claims, and the purchaser had contracted to buy it free from their claims, the sale had been confirmed, the court had caused the property to be conveyed to the purchaser, that purchaser had paid for it, had issued its stock and bonds, they had been put upon the market, all relations and rights of those interested in the property had radically changed, and the proceeds of the sale of the property had been distributed to those entitled to it, and, finally, because no justification or reasonable excuse for this misleading silence and inaction has been established.

The result of the whole matter is that the court is unable to resist the conclusion that the equity of the purchaser, the St. Louis-San Francisco Railway Company, is superior to the equities of the interveners here, that it would be contrary to the familiar and established

rules of equity jurisprudence and would be inequitable after the negligence and long delays of the interveners to permit them to maintain their claims and obtain decrees imposing the losses they may suffer from their own neglect and inaction upon the purchaser and the holders of its stock and bonds who have not failed in diligence in addition to the purchase price for which the court contracted to sell and did sell and convey the property to the St. Louis-San Francisco Railway Company. For these reasons the intervening petition must be dismissed.

[15] The court has not failed to note nor to consider the facts that in the action at law against the railroad company for damages resulting from the collection of excessive charges brought in the United States District Court at Kansas City that court allowed to the interveners by its judgment against the railroad company on August 16, 1916, certain amounts as attorneys' fees for the interveners, that they pleaded these facts in their intervening petitions of December 2, 1920, and asked to recover these attorney's fees of the purchaser, the St. Louis-San Francisco Railway Company, on the ground that the receivers in this suit, who were not parties to those actions at law, through their attorneys defended them, but the attorney's fees were allowed by those judgments and arose before the confirmation of the foreclosure sale, more than four years before the interveners filed in this court any petitions or claims for them. The equities of those claims are inferior to those of the rights of the railway company under the foreclosure decree and sale, for the same reasons that the claims that have already been considered are, and for the further reason that the fact that the receivers deemed it their duty to and did defend those actions at law against the railroad company to which they were not parties did not impose upon them in these cases, much less upon the purchaser under the foreclosure sale, any liability at law or in equity to pay the attorney's fees which the court at Kansas City adjudged a liability of the railroad company only. For like reasons the claims of the interveners by supplemental petitions filed after December 2, 1920, for decrees against the railroad company for the payment by it of attorney's fees allowed to the interveners against the railroad company by the court at Kansas City subsequent to December, 1920, cannot be sustained, and the supplemental petitions in intervention as well as the original petitions must be dismissed.

Nor has the court failed to consider whether or not the interveners would be entitled to a recovery from the railway company, if they had not been barred from any such relief by their laches. They insist that they are entitled to decrees against the railway company because (1) the railway company collected and received the excessive charges unlawfully, and thereby became a trustee ex maleficio thereof for the benefit of the interveners, that they have traced the trust moneys thus collected from the railroad company to the receivers, and from the receivers into the property bought by the railway company at the foreclosure sale; and (2) because their claims against the property of the railroad company on account of these collections were prior in right and superior in equity to the claims on or to that property of all

prior mortgagees and lienholders and of all other parties whomsoever under the rule which permits a court of equity which has seized by its receivers and impounded the property and income of a railroad company for the benefit of mortgage bondholders and other like lienholders to prefer to their claims in equity and in payment that small class of unpaid claims which arise from the current expenses of the ordinary operation of the railroad for wages, supplies, materials; and such necessities of operation during six months immediately before the income is thus impounded.

[16] But if the railroad company ever became a trustee ex maleficio of the moneys it collected from these excessive charges, it became such day by day as it collected them between January 29, 1906, and November 17, 1908. The interveners' causes of action to enforce that trust accrued prior to the latter date, and, if there was such a trust, every impediment to the prosecution of a suit or proceeding to enforce it, either in this suit or elsewhere, if there ever was any impediment, was removed on January 12, 1914, when the Commission made its orders of reparation. The interveners never commenced any proceeding to enforce such a trust, never pressed or suggested such a trust, until they presented their intervening petitions herein on December 2, 1920, and, as has already been held, they were estopped by this delay from enforcing it against the railway company.

[17] During the time when the collections of these excessive charges were made these charges were parts of the freight rates duly established, scheduled, filed, published, and in force in strict compliance with the requirements of the Act to Regulate Commerce. They were during this time the legal established rates and the only rates which the railroad company could collect without a violation of the Act to Regulate Commerce. The issue whether or not they were unreasonable or unjust was pending and in process of hearing and decision, but not yet decided, before the Interstate Commerce Commission. Section 1 of the Act to Regulate Commerce (U. S. Compiled Statutes, § 8563) prohibited any unjust and unreasonable charge. Section 6 (7), being U. S. Compiled Statutes, § 8569, prohibited the railroad company from collecting or receiving a greater or less or different compensation for the transportation here involved than that specified in the established schedules, and section 10 of the act (U. S. Compiled Statutes, § 8574) imposes a penalty for a violation of this provision, and the Supreme Court had held that:

"If, as a fact, the rates were unreasonable, the shipper was nevertheless bound to pay and the carrier to retain what had been paid, leaving, however, to the former the right to apply to the Commission for reparation." Penn. R. R. Co. v. International Coal Company, 230 U. S. 184, 197, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Texas & Pacific Railroad Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 437, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075.

The railroad company collected these legally established rates. It had the decision and direction of the highest judicial tribunal in the land for its justification, and this court is of the opinion that its collection of these rates was not unlawful. The prohibition of section 1 and that of section 6 must be read and interpreted together, and the

correct construction of them is that the specific prohibition of section 6 constitutes an exception from the general prohibition of section 1. A construction that each prohibition is of equal force and equally applicable in such a case as that in hand would impose upon the carrier a penalty of a violation of section 1 if it complied with section 6, and the penalty of a violation of section 6 if it complied with section 1, and an interpretation which leads to such an absurdity ought to be rejected. Potter's Dwarris on Statutes and Constitutions, 128, rule 15.

The act of Congress imposed upon the railroad company the duty to establish freight rates and publish schedules of them as prescribed by the act and made the rates so established by it the legal rates. The railroad company so established the rates. It was its duty to its stockholders and creditors to establish compensatory rates and to the shippers to establish reasonable rates. The legal presumption is that it intended and endeavored to establish rates that were both compensatory and reasonable. A trustee ex maleficio of moneys or property is one who has acquired it by a violation of some provision of the moral or legal code. Fraud, misrepresentation, deceit, violation of some law, or some other like act or representation, something that taints the conscience, is indispensable to the raising of such a trust or the making of one such a trustee. Mr. Pomeroy says:

"An exhaustive analysis would show, I think, that all instances of constructive trust properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source." Pomeroy's Equity Jurisprudence, § 1044.

Because the collection of these excessive charges was not unlawful, because the railroad company by their collection was guilty of no fraud, misrepresentation, deceit, or violation of the moral or legal code, it did not take these collections as a trustee ex maleficio, no trust arose, and no cause of action to enforce such a trust ever accrued here.

[18, 19] Moreover, this alleged cause of action to charge the railroad company as a trustee ex maleficio of the moneys collected by it from the excessive charges is not maintainable: (1) Because it is not consistent with and is abrogated by the Act to Regulate Commerce and by the exclusive remedies for such collections by reparation prescribed by that act; and (2) because the interveners are estopped from maintaining it by their prosecution of their inconsistent remedy by reparation under the act of Congress from 1906 to December, 1920. Act to Regulate Commerce, §§ 8, 10 (U. S. Compiled Statutes, §§ 8572, 8574). The theory and indispensable basis of the alleged trust is that the ownership of the moneys collected by the company from the excessive charges never passed from the interveners to the collector, but that the latter took and its successor in interest still hold those moneys in trust for the owners, the interveners. The theory and the indispensable basis for the remedy by reparation provided by the Act to Regulate Commerce is that the interveners lost the title and ownership of the moneys collected by the company, were damaged by that loss, and that those damages are to be paid by the reparation provided by Act to Regulate Commerce, §§ 8 and 10 (U. S. Compiled Statutes, §§ 8572, 8574). The theory and indispensable basis of the alleged trust is that

the ownership of the moneys collected by the company from the excessive charges never passed from the interveners to the collector, but that the latter took and its successors in interest still hold those moneys in trust for the owners, the interveners. The theory and the indispensable basis for the remedy by reparation provided by the Act to Regulate Commerce is that the interveners lost the title and ownership of the moneys collected by the company, were damaged by that loss, and that those damages are to be paid by the reparation provided by Act to Regulate Commerce, §§ 8 and 10 (sections 8572, 8574, supra). In Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, the Supreme Court in effect held that the remedy by reparation prescribed by the Act to Regulate Commerce for the collection of excessive charges, where, as in this case, a decision of the Interstate Commerce Commission was essential to determine the unreasonableness and the extent of the unreasonableness of the rates, was exclusive, and that no action at common law could be maintained on account thereof. That act is no less prohibitory of a remedy by a proceeding or suit in equity to charge the collector of the excessive charges as a trustee ex maleficio thereof. Every reason given by the Supreme Court why the act practically abrogates actions at law on account of the collections of such excessive rates applies with equal force to the suit or proceeding to enforce such a trust, together with the further and not less conclusive reason that the basis of such a suit or proceeding is not only inconsistent with, but diametrically opposed to, the basis and theory of the remedy by the reparation for damages prescribed by the act of Congress.

The remaining question is: Are the claims of these interveners members of that small class of unpaid claims, the considerations of which were parts of the current expenses of the ordinary operation of the railroad for wages, supplies, materials, and like necessities of operation during the six months immediately preceding the impounding of the income by this court in 1914 for the benefit of the holders of bonds secured by prior recorded mortgages. To support an affirmative answer to this question and their trust theory counsel cite and seem to rely with confidence on the decision of the Court of Appeals of this circuit in Love v. North American Co., 229 Fed. 103, 143 C. C. A. 379. The opinion in that case has been thoughtfully studied and considered before reaching any of the conclusions on these subjects in the case in hand. But the decision of that case was not conditioned by the provisions of the Act to Regulate Commerce or by proceedings thereunder, the excessive charges in that case were collected within approximately six months preceding the receivership, and the material facts of that case were, in the opinion of the court, so radically different from those in the case under consideration that the decision and opinion therein are inapplicable to them.

[20] It is indispensable to that equity which permits a court of chancery to decree the claim of an unsecured creditor to the property of a railroad company or its proceeds prior in right, superior in equity, or preferred in payments to the claims of bondholders secured by prior

recorded mortgages or liens: (1) That the consideration of such a claim was a part of the current expenses of the ordinary operation of the property of the mortgagor incurred in the usual course of its business for labor, supplies, or other like necessities of operation, Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 124, 141, 149, 44 C. C. A. 389, 52 L. R. A. 481; Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 259, 296, 20 Sup. Ct. 347, 44 L. Ed. 458; Lackawana Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475; Chicago & A. Railroad Co. v. United States & Mexico Trust Co., 225 Fed. 940, 943, 141 C. C. A. 64; Rodger Ballast Car Co. v. Omaha, Kansas City & E. Ry. Co. et al., 154 Fed. 629, 83 C. C. A. 403; and (2) that the consideration was paid and the liability of the mortgagor company on account thereof was incurred within six months immediately preceding the impounding of the property by the court for the benefit of the bondholders, Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 292, 20 Sup. Ct. 347, 44 L. Ed. 458; Westinghouse Air Brake Co. v. Kansas City Southern Ry. Co., 137 Fed. 26, 40, 71 C. C. A. 1; Blair v. St. Louis, H. & K. Ry. Co. (C. C.) 22 Fed. 471, 474; Crane v. Fidelity Trust Co., 238 Fed. 693, 696, 697, 151 C. C. A. 543.

[21] The reason for the allowance of the preferential payment of claims for wages, supplies, and like necessities of the ordinary operation of the railroad during six months immediately preceding the impounding of its property and income is that the holders of such claims may rely for the payment thereof, not upon the personal liability of the railroad, but upon the expected income from the operation of the railroad company for the succeeding six months, and upon the practice of courts of equity, upon impounding the property and its income to give such claims preference in payment over the payment of claims secured by prior recorded liens. But the claims of these interveners are not claims for wages, supplies, or any such like necessities of the ordinary operation of the railroad. They are for a part of its income. They are for the collection from the interveners of excessive charges. Such collections were not a part of the usual or necessary expenses of the operation of the railroad. Railroad companies do not ordinarily and usually in their operation collect excessive charges. They were a part of the unusual and, the Commission afterwards held, of the unnecessary income of the mortgagor. Nor did the interveners pay them in reliance upon the expected income of the railroad company for the six months succeeding the respective times of their payments in 1907 and 1908, but their reliance was upon the personal reliability of the railroad company. So it is that these claims fall neither within the class of preferential claims nor within the reasons for the existence of that class.

Nor were the payments of these charges made nor did the railway company incur its liability on account of their collection within six months or approximately within six months immediately preceding the impounding of the property and income of the railroad company for the benefit of the bondholders in 1914. On the other hand, these payments were made and the liability of the railroad on account of

them was incurred more than five years before that impounding. While it is true that there are courts which have sometimes allowed preferences in payments to claims that have accrued more than six months before the impounding, the established rule of the Supreme Court and of the courts of this circuit limits the allowance of such claims to those incurred within six months or approximately within that time.

The enforcement of a rule limiting the allowance of preferential claims of this character to those incurred within that time is both reasonable and necessary to the protection of claims secured by prior recorded mortgages and liens. Preferential claims of this class are not of record—are generally incurred without notice to or the knowledge of the holders of prior recorded liens. If during longer periods than six months, if during many more months or during years, the mortgagor and its unsecured creditors may continue to create such preferential liens, they can thus pile up large debts of the mortgagor secured by secret liens paramount to the liens of the mortgages and of other recorded liens upon the property of the mortgagor; by paying the interest, or causing it to be paid, on the bonds secured by the prior liens meanwhile, they can deprive the bondholders of the possession and application of the property to their claims until their security is destroyed or so impaired that their wiser course may be to abandon the property to the holders of such secret preferential claims. It was to prevent such results that this limitation was established, and it is a just and equitable one. Westinghouse Air Brake Co. v. Kansas City & Southern Railway Co., 137 Fed. 26, 40, 71 C. C. A. 1, and cases there cited.

The reason that six months immediately preceding the impounding for the benefit of the secured liens has been generally fixed as the time within which such preferential claims may arise is because usually a six-months interval passes between the dates when installments of interest on bonds fall due, and because mortgages provide, and when they do not parties in interest assume, that when an installment of interest is paid current expenses to that time have either been paid or funds to pay them have been provided. Crane v. Fidelity Trust Co., 238 Fed. 693, 696, 151 C. C. A. 543.

For the reasons which have now been stated the court finds itself unable to resist the conclusion that; if the prosecution of the proceedings commenced by the intervening petitions herein had not been barred by laches, the claims of the interveners to liens upon or interests in the property or the proceeds of the property of the mortgagor company prior in lien or right or superior in equity to the prior recorded liens of the mortgages foreclosed could not be sustained.

Let the intervening petitions and supplemental petitions be dismissed, without costs to either party.