**SPILLER et al. v. St. LOUIS & S. F. R. CO. et al.**[*]

(Circuit Court of Appeals, Eighth Circuit. June 24, 1926.)

No. 6786.

**I. Receivers ⬦149—Shipper's failure to file claims for reparations in receivership suit against railroad before expiration of time allowed therefor held not laches, barring recovery (Interstate Commerce Act, § 16 [Comp. St. 8584]).**

Failure of shippers, prosecuting claims for reparations before Interstate Commerce

*Certiorari granted 47 S. Ct. 111, 71 L. Ed. ——.

Commission and later before courts, under Interstate Commerce Act, § 16 (Comp. St. § 8584), to file such claims in pending receivership proceedings against railroad before expiration of time for filing claims fixed by interlocutory decree in such proceedings, *held* not laches, barring recovery on claims filed after favorable judgment in courts.

**2. Equity ⬦87(1).**

Laches is an equitable doctrine, not controlled by nor dependent on statutes of limitation.

**3. Equity ⬦84.**

Applicability of doctrine of laches is dependent on circumstances of each particular case.

**4. Equity ⬦71(1).**

Mere lapse of time, without appearance of anything making it inequitable to grant relief sought, does not constitute laches.

**5. Equity ⬦70.**

Laches cannot exist against a party who has not legal knowledge of facts affecting his rights.

**6. Equity ⬦67.**

Doctrine of laches is to assist and not defeat justice; hence it is determined by considerations of justice.

**7. Equity ⬦80.**

A party responsible for or who has contributed to delay cannot interpose defense of laches.

**8. Equity ⬦84.**

Notice of claims against railroad is insufficient to destroy any estoppel established by laches of shipper, but may be considered as an element bearing on question of laches.

**9. ·Railroads ⬦192.**

Shipper, intervening and asserting claims in receivership suit against railroad after final decree and sale of railroad's property, *held* bound by prior orders and decrees in suit.

**10. Railroads ⬦194(6)—Purchasers of railroad property at receiver's sale held to take subject to claims of shippers who intervened.**

Where decree directing receiver's sale of railroad property required purchasers to take subject to any unpaid claims of creditors, "which shall have been or shall be admitted * * * or adjudged * * * to be prior in lien or superior in equity to the refunding mortgage, * * *" and subject to unpresented claims "which may arise after the entry of this decree," *held*, purchasers took subject to claims of shippers, who intervened before confirmation of sale, asserting claims for reparations then being litigated at law.

**11. Judgment ⬦524.**

In determining meaning of words, courts must take into consideration their conjunction with other words and the purpose of their use.

**12. Railroads ⬦194(6)—"Arise," as used in decree for sale of railroad, held to mean to appear, to become, or to present itself.**

"Arise," as used in decree for sale of railroad's property subject to unpresented claims

"which may arise after the entry of this decree," *held* to mean to appear, to become, 'to present itself, and not synonymous with "accrue," nor used in the sense of "originating."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Arise—Arising.]

13. Carriers ☞200—Railroad, unlawfully exacting unreasonable rates, held to hold the portion of such freight unlawfully exacted as trustee ex maleficio for shippers (Interstate Commerce Act, § 1, subd. 3, and section 6 [Comp. St. §§ 8563, 8569])..

Railroad, which in violation of Interstate Commerce Act, § 1, subd. 3 (Comp. St. § 8563), continued to collect freight at rates which Interstate Commerce Commission had declared were unjust and unreasonable, *held* to hold the portion of such freight unlawfully exacted as trustee ex maleficio for shippers, nor were such rates validated by their continued publication, required by section 6 (Comp. St. § 8569).

14. Carriers ☞200.

The charging of an excessive and unreasonable freight is ipso facto unlawful.

15. Trusts ☞95.

A trusteeship ex maleficio, while ordinarily arising out of fraud or deceit, may arise out of duress or other unconscionable manner of obtaining property.

16. Trusts ☞352—That unreasonable freight charges unlawfully exacted had been commingled with other funds held not to preclude holding that railroad was trustee ex maleficio for benefit of shipper.

That unreasonable freight charges unlawfully exacted had been commingled with other moneys of railroad and used *held* not to preclude holding that as to such moneys railroad was trustee ex maleficio for benefit of shipper, it being shown that railroad or its receiver at all times held funds in excess of shipper's claim.

17. Carriers ☞202.

Shipper's right to reparation under Interstate Commerce Act, § 22, is not exclusive remedy, precluding recovery of illegal freight exactions, on theory of trusteeship ex maleficio (Comp. St. § 8595).

18. Receivers ☞152—Shippers, having obtained judgment for unlawful freight exactions and then intervened in receivership suit, held not estopped to claim priority on theory of trusteeship ex maleficio of carrier.

Shippers having obtained judgment for unlawful freight exactions by action under Interstate Commerce Act, § 16 (Comp. St. § 8584), and thereafter intervened in receivership suit against carrier, *held* not estopped to assert priority on theory of trusteeship ex maleficio of carrier, nor relegated to status of general unsecured creditor because section 16 provides for collecting "damages."

19. Receivers ☞155.

Shippers, having obtained judgment on claims for illegal freight exactions and thereafter intervened in receivership suit against railroad, *held* not entitled to priority under rules giving preference to claims for operating expenses.

20. Receivers ☞152.

Shippers, having obtained judgments on claims for unlawful freight exactions and thereafter intervened in receivership suit against carrier, *held* not entitled to preferred claims for attorney fees.

Appeal from the District Court· of the United States for the Eastern District of Missouri; Walter H. Sanborn, Judge.

Consolidated suits by the North American Company and by the Rail Joint Company against the St. Louis & San Francisco Railroad Company. From a decree (288 F. 612), dismissing intervening petitions of E. B. Spiller and others, they appeal. Reversed and remanded, with instructions.

David A. Murphy, of Kansas City, Mo., and Walter H. Saunders, of St. Louis, Mo. (S. H. Cowan, of Fort Worth, Tex., and John S. Leahy, of St. Louis, Mo., on the brief), for appellants.

E. T. Miller, of St. Louis, Mo. (W. F. Evans, of St. Louis, Mo., on the brief), for appellees.

Before STONE, KENYON, and BOOTH, Circuit Judges.

KENYON, Circuit Judge. The history of this controversy extends over a period of nearly 20 years. It is difficult to cover the facts in a brief narrative. However we endeavor so to do. The findings of the master and the statement by the trial court have little in dispute as to the controlling facts.

In 1903 the St. Louis · & San Francisco Railroad Company, appellee (hereafter designated as the Railroad Company), and other railroads not here involved, advanced freight rates on cattle shipments from the state of Texas and other Western states to Kansas City, Chicago, St. Louis, and other primary markets 3 cents per hundredweight. These rates were challenged by divers parties as unreasonable, unjust, and unlawful; the special challenge being by the Cattle Raisers' Association of Texas. The Interstate Commerce Commission (hereinafter called the Commission) on August 16, 1905, found the rates to the extent of the increase of 3 cents per hundredweight to be unjust and unreasonable. Cattle Raisers' Ass'n of Texas v. Mo., K. & T. R. Co., 11 Interst. Com. Com'n R. 296.

Prior to the passage by the Congress of what is known as the Hepburn Act, June 29, 1906 (34 Stat. 584), there was no power in the Commission to prescribe rates for

transportation of property. After this act became effective a petition was filed with the Commission to reopen the case. April 14, 1908 (Cattle Raisers' Ass'n of Texas v. Mo., K. & T. R. Co., 13 Interst. Com. Com'n R. 418), the Commission reaffirmed its position of August 16, 1905, and again pronounced the rates excessive and unreasonable, and made an order prescribing rates for the future to take effect November 17, 1908, being the rates existing prior to 1903, viz. 3 cents less per hundredweight. Questions of reparation to be allowed only from August 29, 1906, were reserved by the Commission, to be subsequently dealt with. This order was contested in the courts by the Railroad Companies.

Appellant Spiller (hereinafter with others designated as interveners) presented claims for reparation, based on said excessive rates exacted from August 29, 1906, to November 17, 1908, which were heard from time to time, and on January 12, 1914, the Commission made an order in which it directed the defendant Railroad Company to pay to intervener Spiller, who was assignee of a large number of claims, the sum of $27,682.75, plus interest to June 15, 1914, and also to pay to other shippers, who had not assigned their claims to Spiller, certain amounts as reparation for the excessive rates aggregating $3,244.61.

May 27, 1913, on the bill of complaint of North American Company (a general creditor), filed in the United States District Court, Eastern District of Missouri, receivers were appointed for the Railroad Company, who took over the general control, management, and operation of its properties. A like bill was filed by another creditor on April 3, 1914. After the appointment of the receivers, and within the time prescribed by the Act to Regulate Commerce, the orders of reparation made by the Commission in favor of interveners were served upon the Railroad Company and its receivers. They refused to pay the moneys which the Commission had ordered paid. May 22, 1914, the trustees under the general lien mortgage of the Railroad Company dated August 27, 1907, filed bill for foreclosure. July 9, 1914, the trustees of the Railroad Company's refunding mortgage dated June 20, 1901, filed a bill for foreclosure. The same receivers theretofore appointed were appointed in these proceedings and the entire matter was consolidated in a single suit entitled "North American Company, Complainant, v. St. Louis & San Francisco Railroad Company, Defendant, No. 4,174, Consolidated Cause Final." The final decree was rendered in the consolidated cause and each of its constituent causes.

On December 29, 1914, intervener Spiller filed suit under the provisions of section 16 of the Interstate Commerce Act (Comp. St. § 8584) in the District Court of the United States for the Western Division of the Western District of Missouri at Kansas City against the various railroads to enforce payment of the amount and interest that the Commission had ordered paid. The other interveners also filed suit. Attorneys employed by the receivers appeared in these cases and contested the same. Suits were also filed at Forth Worth and St. Louis by the same parties against the carriers, on the same cause of action, but were subsequently dismissed. Other railroad companies were joined as defendants in the suits at Kansas City, but they are not interested parties here. These cases proceeded to trial, and on August 16, 1916, intervener Spiller recovered judgment in the sum of $30,212.31, with interest thereon from August 1, 1916, and also judgment for $3,021.23 as attorney fees to be taxed as costs. The other appellants in this suit (sometimes hereafter designated as other interveners) recovered judgment for $3,658.55, with interest likewise, and $364.63 attorney fees, to be taxed as costs. Appeal was taken to this court on August 28, 1916, by the attorneys employed by the receivers of the Railroad Company. The attorneys for the Railway Company were also engaged in the case after November 1, 1916. It was agreed by stipulation that the appeal, while taken only in the case of E. B. Spiller v. Missouri, Kansas & Texas Railway Company et al., should be controlling in the case of E. B. Spiller et al. against the same defendants.

In the meantime an interlocutory decree had been entered in the receivership suit May 29, 1914, requiring that all claims against the Railroad Company be filed by October 1, 1914. These orders were extended and the final time for filing claims expired February 1, 1916. March 31, 1916, the final decree of foreclosure, providing for sale of the Railroad Company's property was entered, and on July 16, 1916, the property was sold either to or for the St. Louis & San Francisco Railway Company (hereinafter called the Railway Company). This sale was confirmed on August 29, 1916, which was 13 days after the judgments were rendered in the District Court at Kansas City before referred to, and the day after the Railroad Company had appealed from the

same to this court. The Railway Company took charge of the properties about November 1, 1916. Prior to August 29, 1916, the date of the confirmation of the sale, interveners had no notice or knowledge of any order made by the court fixing the time within which claims could be filed in the cause. Notice of said order was made by publication, but no publication was made in Texas or Oklahoma, where all but-a few of the claimants lived.

On August 29, 1916, attorneys for interveners gave notice in open court that they had claims against the defendant Railroad Company for illegal freight exactions, that the claims had been reduced to judgment in the District Court of the United States for the Western Division of the Western District of Missouri, that an appeal was being taken from said judgment by the Railroad Company and other carriers, and that the contention of the interveners was that their claims were prior in right and superior in equity to the claims of all other creditors, including bondholders. A written notice to the same effect was also served at the same time upon Henry W. Taft, attorney for the reorganization committee, and the Railway Company; also upon the attorney for the receivers and the attorney for the Railroad Company.

Under the plan of reorganization, securities of the new company were to be exchanged for securities of the old. The original plan was not approved by the Public Service Commission of Missouri, or at least it required modification thereof, and under the accepted plan of reorganization the stockholders of the old company were to receive and did receive more than $45,000,000 of the stock of the new company, as representing their equity in the property, without the payment of anything therefor. There is some claim in argument that this is not correct, but the record we are satisfied sustains it as a fact. A large amount of cash was turned over to the receivers by the Railroad Company (approximately $300,000) much in excess of the claims of interveners, and a large amount of cash was also turned over by the receivers to the reorganized Railway Company largely in excess of the claims of interveners.

October 29, 1917, this court (246 F. 1) reversed the judgment of the District Court of the United States for the Western Division of the Western District of Missouri, and remanded the case for a new trial, its mandate being filed March 27, 1918; the judgment having been modified to some extent

on March 11, 1918 (249 F. 677). Interveners then took the case to the Supreme Court of the United States by certiorari. On May 17, 1920, the Supreme Court of the United States (253 U. S. 117, 40 S. Ct. 466, 64 L. Ed. 810) reversed the judgment of this court, and affirmed the judgment of the District Court for the Western Division of the Western District of Missouri; the mandate of the Supreme Court being filed in that court June 6, 1920. Applications were filed in that court for additional attorney fees, which were allowed.

December 2, 1920, interveners applied to the District Court of the Eastern Division of the Eastern District of Missouri for leave to file in the consolidated receivership cases intervening petitions setting forth their claims against the Railroad Company for illegal exactions of freight rates, for which they had secured judgment in the United States District Court for the Western District of Missouri on August 16, 1916. On February 12, 1921, the court granted the applications, and on March 10, 1921, granted applications to file supplemental intervening petitions. The matter was referred to a master, who heard the same and made extended findings of fact and conclusions of law; his recommendations being that judgment be entered in favor of intervening petitioner, E. B. Spiller, in the sum of $30,212.31, with interest at 6 per cent. per annum from August 1, 1916, being the amount awarded by the judgment of the United States District Court at Kansas City, and that judgment also be entered in favor of intervener E. B. Spiller in the sum of $1,235.13, balance unpaid of attorney fees, and that the entire amount of $31,447.44 be adjudged as prior in lien and superior in equity to the refunding mortgage and the general lien mortgage of the Railroad Company, and that it should be enforced against the property conveyed to the Railway Company, and also recommended that similar judgment be entered in favor of the other interveners, E. B. Spiller et al., in the sum of $3,652.97, with interest likewise at 6 per cent. from August 1, 1916, and also $365.29 as attorney fees.

The trial court did not sustain the conclusions of law of the master, and held that interveners were barred by laches from presenting their claims, and were especially barred because they did not file them in accordance with the terms of the interlocutory orders and the final decree, and held also that, were they not barred by laches and estopped by the failure to file their claims,

they could not recover as preferential claimants, under the doctrine that the Railroad Company had become a trustee ex maleficio for their benefit, because such remedy was inconsistent with and abrogated by the Act to Regulate Commerce and the exclusive remedies therein prescribed; further that they were estopped from maintaining an action on the theory that a trust ex maleficio had been created, as they had resorted to an inconsistent remedy, i. e., reparation under the Act to Regulate Commerce. The court also found that interveners were not entitled to preference on the current expense and wage theory, commonly known as the six months rule. The conclusion of the learned trial court is concisely stated at the close of the opinion in North American Co. v. St. Louis & S. F. R. Co. (D. C.) 288 F. 612, 633, as follows: "For the reasons which have now been stated, the court finds itself unable to resist the conclusion that, if the prosecution of the proceedings commenced by the intervening petitions herein had not been barred by laches, the claims of the interveners to liens upon or interests in the property or the proceeds of the property of the mortgagor company prior in lien or right or superior in equity to the prior recorded liens of the mortgages foreclosed could not be sustained." The intervening and supplemental intervening petitions were dismissed.

This is a brief résumé of transactions covering a long period of time, during which interveners have tried to collect moneys which they claim were wrongfully taken from them by excessive, unjust, and unreasonable freight rates. Other facts will be referred to subsequently. Appellees suggest that the assignments of error are too general to direct the court's attention to the questions involved. We are satisfied the controlling questions are sufficiently before us in the assignments of error, and consider the case from that viewpoint.

[1] Were interveners estopped by laches from asserting their alleged rights? The trial court was of the opinion they were, and on this subject said: "If such a suit or application is brought after the time fixed by the analogous statute of limitations at law, the burden is upon the complainant or petitioner to plead and prove unusual conditions, or extraordinary circumstances, which make it inequitable to apply the settled rule and stay the proceedings, notwithstanding the fact that the analogous limitation expired before this suit or application was brought. This case falls in the latter class. The times of the statutory limitations of the analogous ac-

tions at law had all expired long before the petitioners presented their applications for intervention, and their petitions ought to be dismissed under the settled rule, unless by pleading and proof they have established preponderant equitable reasons why they should be exempted from its operation." North American Co v. St. Louis & S. F. R. Co. (D. C.) 288 F. 612, 621, 622.

[2] Laches is an equitable doctrine, not controlled by or dependent upon statutes of limitation, although courts quite generally consider the time fixed by such statutes in actions at law of like character as having some bearing on the pertinency of the doctrine of laches, or, perhaps more accurately stated, on the burden of proof with respect thereto.

[3] The applicability of the doctrine of laches is dependent upon the circumstances of each particular case. Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738; Abraham v. Ordway, 158 U. S. 416, 15 S. Ct. 894, 39 L. Ed. 1036; Jackson v. Jackson et al., 175 F. 710, 99 C. C. A. 286; Buchler v. Black et al., 226 F. 703, 141 C. C. A. 459; Taylor v. Salt Creek Consol. Oil Co. et al. (C. C. A.) 285 F. 532.

[4] Mere lapse of time does not constitute laches. In addition, it must appear that something has occurred that would make it inequitable to grant the relief prayed for. Schwartz v. Loftus et al., 216 F. 320, 132 C. C. A. 464; Minnesota Mut. Inv. Co. v. McGirr et al. (C. C. A.) 263 F. 847, 855; Meyer et al. v. Ritter (C. C. A.) 268 F. 937; Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; Southern Pac. Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099.

[5] Laches cannot exist as to a party, unless he has legal knowledge of the facts affecting his rights. Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738.

[6] The doctrine of laches is to assist and not to defeat justice—it is to be determined by considerations of justice. Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 F. 137, 148, 53 C. C. A. 341; Drees v. Waldron, 212 F. 93, 128 C. C. A. 609; Mathieson v. Craven (D. C.) 247 F. 223, 226; Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 S. Ct. 258, 40 L. Ed. 383.

[7] It is sound doctrine that, if a party interposing defenses of laches has been responsible for and substantially contributes to the delay, he is precluded from taking advantage thereof. 5 Pomeroy's Eq. Jurisprudence, § 35; Northern Pac. Ry. Co. et al. v. Boyd, 177 F. 804, 101 C. C. A. 18; Taylor v. Salt Creek

Consol. Oil Co. et al. (C. C. A.) 285 F. 532. In Northern Pac. Ry. Co. et al. v. Boyd, supra, the court said: "It is impossible to escape the conviction that the delay was not prejudicial to the appellant, but was to its advantage, and that it was largely caused by its own acts. * * * Where the party interposing a defense of laches has contributed to or caused the delay, he cannot take advantage of it."

Measured by these principles, does the history of this litigation justify barring consideration of interveners' claims on the general ground of laches? In 1904 the rates that had been established by the carriers, including the Railroad Company, for shipments of cattle from Texas, were challenged before the Interstate Commerce Commission. In 1905 the Commission found the challenge was warranted and that the rates were excessive to the extent of 3 cents per hundredweight. The Commission was impotent to afford relief until the passage of the Hepburn Act in 1906. After that interveners again brought this matter before the Commission in 1906 and 1908, when the decisions of 1905 as to these rates were reaffirmed. Reparation was ordered in 1914 and demand made on the Railroad Company for payment thereof.

Certainly up to that time interveners were guilty of no laches; neither were they in waiting after the award the six months' time the Commission had given the railroads within which to pay the same before taking further action. They might have expected the reparation allowed would be paid, but it was not. They then proceeded as provided in section 16 of the Commerce Act (section 8584, Comp. Stat. 1916), and promptly brought suits in the United States District Court at Kansas City to enforce the orders of the Commission. The record shows no unnecessary delay on their part during the progress of said suits. Judgments were rendered therein August 16, 1916. The affairs of the Railroad Company were then in the hands of receivers. The final decree in the receivership case had been entered before interveners' judgments were secured. The judgments were not paid, but the case was appealed August 28, 1916. Surely interveners were not then delaying the adjustment of matters. While the judgment was in process of appeal, the final sale of the Railroad Company's properties was made and confirmed. Interveners had no actual notice of the interlocutory orders or of the final decree. Their counsel knew that the receivership matters were pending, and, of course, could have known of the orders by a search of the records. Interveners on August 29,

1916, in open court, prior to the confirmation of the sale, notified all parties concerned who were there represented, of their claims. They also served written notice on the same date on Henry W. Taft, attorney for the reorganization committee and the Railway Company, also on the Railroad Company and the receivers, of their claims and that they were of superior equity. Said notice concluded as follows:

"Therefore these plaintiffs, as shown in said judgments, claim that the purchaser of said property takes it subject to all the rights of said plaintiffs, and that their said rights for full payment thereof is a lawful charge against the said St. Louis & San Francisco Railway Company, aforesaid purchaser of the property and assets of the said St. Louis & San Francisco Railroad Company, if the sale be confirmed; that as to said plaintiffs the sale of said property to the St. Louis & San Francisco Railway Company is fraudulent and void, and said plaintiffs, in whose behalf said judgments have been rendered, are entitled to have the property so sold and assets acquired or to be acquired by the purchaser, either the purchasing committee or the St. Louis & San Francisco Railway Company, if it shall be the purchaser, applied to the payment of said plaintiffs' debt by virtue of their rights as judgment creditors."

In the Circuit Court of Appeals (246 F. 1) the judgment of the District Court was reversed, and the claims of interveners were apparently wiped out by the holding of this court. Interveners then took the matter to the Supreme Court of the United States by writ of certiorari, and in May, 1920, the Supreme Court (253 U. S. 117, 40 S. Ct. 466, 64 L. Ed. 810) reversed this court, and affirmed the judgment of the District Court of the United States entered at Kansas City. The mandate of the Supreme Court was filed July 2, 1920. Interveners then filed petitions for attorney fees in the District Court at Kansas City, which were allowed. Through all these years the attorneys for the Railroad Company, the receivers, and the Railway Company fought these demands of interveners. The Railway Company, through its attorneys, conducted the contest in the Supreme Court of the United States. It would seem that the interveners were about as persistently and consistently diligent as litigants could be. Certainly in this general situation there is little to sustain the charge of laches by reason of delay.

In addition to delay it is urged that they were guilty of laches in failing to file their demands, pursuant to the interlocutory orders

entered in the receivership and the final decree, and therefore are now estopped to assert their claims. It is conceded in the record that interveners had no actual notice or knowledge of the interlocutory decrees, or of the final decree until August 29, 1916. The trial court held they had constructive notice. It is the usual and established practice of the courts to require publication of such orders with respect to the time to present claims in receivership matters. It appears in this record that, while nearly all of the interveners and their assignors lived in Texas and Oklahoma, the notices were not published in any papers in those states. It is perfectly apparent that the attorneys of the Railroad Company and of the receivers and all parties interested knew before the final decree in March, 1916, and confirmation of the sale in August, 1916, that interveners in their suits at Kansas City were seeking to recover the amounts allowed by the Commission, and that "the ultimate purpose of the litigation was to obtain satisfaction of the appellee's claim out of the property of the Railroad Company or of the Railway Company." Northern Pac. Ry. Co. v. Boyd, 177 F. 804, 824, 101 C. C. A. 18, 38. The failure to file claims in the receivership case under the circumstances disclosed in this record was not inexcusable neglect. Courts have permitted the filing of claims after the time fixed in interlocutory orders, where justified by equitable circumstances. In the Boyd Case, supra, Boyd filed no claims in the receivership case, and it was held he was not guilty of inexcusable delay.

The trial court in its opinion referring to interveners and the notice in open court of August 29, 1916, said: "If they had then filed a dependent bill, or, as was done in the Boyd Case, an original bill (Northern Pacific Ry. v. Boyd, 228 U. S. 482, 492, 33 S. Ct. 554, 57 L. Ed. 931), or if they had then procured an insertion in the final decree of such an exemption of themselves and their claims from the estoppels thereof as the Guardian Trust Company secured in Central Improvement Co. v. Cambria Steel Co., 201 F. 811, 815, 120 C. C. A. 121, and Kansas City Southern Railway Co. v. Guardian Trust Co., 240 U. S. 166, 174, 36 S. Ct. 334, 60 L. Ed. 579, they might possibly have escaped those estoppels and the fatal consequences of their laches." North American Co. v. St. Louis & S. F. R. Co. (D. C.) 288 F. 612, 623, 624.

[8] While it might have been the better practice to have proceeded by an original bill, yet we think that, in view of the litigation then pending, which the Railroad Company and the receivers were appealing to this court, and the unusual circumstances existing with relation to this entire matter, interveners' rights ought not to be barred by laches because they did not file an original bill or attempt to have themselves exempted from the operation of the final decree. The notice given of their claims would not be sufficient to destroy an estoppel that had been established by laches, but it is an important element, in view of all the circumstances in this case, bearing on the question of whether or not that situation had arisen.

Through all these proceedings the Railroad Company, the receivers, and the Railway Company, who now insist that interveners should have filed their claims, were contending that interveners had no valid claims. They presented that idea so forcibly to this court that it decided interveners could not collect their demands. Were interveners compelled to abandon their efforts in the courts of the United States to fully establish their claims in the manner provided by the Act to Regulate Commerce, and file them in the receivership proceedings, or be guilty of such laches as to preclude recovery if they eventually should be held to be valid claims? We think not.

Who was hurt by the delay? If the theory of interveners is correct, that the money taken in freight rates, repayment of which they were demanding, was wrongfully taken from them by duress, and that the Railroad Company became a trustee ex maleficio thereof, then the bondholders or mortgagees of the Railroad Company had no right to it. Certainly the original stockholders of the Railroad Company had no such right. They were not injured by the delay. None of the parties were entitled to have the value of their properties enhanced by the wrongful appropriation of others' moneys.

If the circumstances of this case are not so unusual and extraordinary as to excuse the claimed laches, it would be difficult to conceive of a situation sufficient to accomplish that result. Through all these years interveners, against the constant opposition of the Railroad Company, the receivers, and the Railway Company, were attempting to collect the money wrongfully taken from them in unjust and excessive freight rates. If there has been unnecessary delay in presenting the claims for final action, appellees have contributed thereto. To now say that appellants are barred by laches from insisting upon their rights would, it seems to us, make that doctrine an instrumentality to defeat rather than promote justice.

[9] It is claimed interveners were bound by

the interlocutory and final orders in the receivership proceedings, and estopped from disregarding or assailing the validity of the decrees or the sale. The trial court so held, and such is the doctrine of the authorities. Under the holdings of this court, interveners were in the same situation, bound by the same orders and decrees, and subject to the same estoppels as if they had been parties to the suit when the same were made. Swift v. Black Panther Oil & Gas Co., 244 F. 20, 156 C. C. A. 448; Commercial Electrical Supply Co. v. Curtis et al. (C. C. A.) 288 F. 657. To the writer there seems an apparent element of injustice in permitting a party to intervene and present his claim, take his evidence, go to the expense of a trial, and then say to him, "At the time you intervened your rights were barred by a final decree entered long prior to the time the court gave you the right to intervene." Such intervention becomes a useless procedure. Possibly the answer is, if parties do not desire to be so barred, they should not intervene, but should bring an original bill.

It is urged by interveners that, if they are bound by the orders and decrees entered before their intervention, then they are entitled to any rights they might have if their petition of intervention had been actually on file at the time of the interlocutory and final decrees, and that, if such be the situation, they had claims remaining untried at the time of the entry of the final decree, and therefore the interlocutory decree and the final decree constitute no bar as to them; further, that if they were actually to be considered in the case prior to intervention they were entitled, under the doctrine of Northern Pacific Railway Co. v. Boyd, 228 U. S. 483, 33 S. Ct. 554, 57 L. Ed. 931, to a fair offer under the reorganization plan of stock or cash for their claims, the same as other creditors, and that, as no such offer was ever made, the decree is void as to them. In the view we take of the matter, there is no necessity of considering these somewhat interesting questions.

[10] We are satisfied that, while interveners are not estopped from prosecuting their demands by the general doctrine of laches, they are under the decisions of this court bound by the terms of the final decree. They have proceeded on the theory of presenting their demands under the terms of that decree, and in the intervening petitions assert their rights "pursuant to the final decree." We consider, therefore, the terms of that decree. It provides (article 9) that the purchasers of the property shall take the same subject to "(B) any unpaid claims of creditors of the defendant Railroad Company, which have been or

shall be admitted by the parties in interest or adjudged by this court to be prior in lien or superior in equity to the refunding mortgage or to the general lien mortgage." Article 10 thereof provides for the receivers filing statements showing:

"(b) All unpaid indebtedness and liabilities contracted or incurred by the defendant Railroad Company prior to the appointment of the receivers in the operation of the property directed by this decree to be sold, and which so far as they are informed are claimed to be prior in lien or superior in equity to the refunding mortgage; * * *

"(e) All claims and demands against the defendant Railroad Company which have been filed in this cause pursuant to the orders heretofore entered herein, save such as may have been paid and discharged in full. * * *

"Notice having been given for the presentation in this cause of claims and demands against the defendant Railroad Company of every character and description whatsoever, and the time for the presentation of said claims having expired, no such claim or demand which has not been presented in this cause, in accordance with the orders heretofore made requiring presentation thereof other than * * * (2) any claim or demand which may arise after the entry of this decree, shall be enforceable against the receivers, or against the property sold, or any part or portion thereof, or against any purchaser of the same, or any part thereof, his successors or assigns."

The receivers did not list the demands of interveners under subdivision (b), article 10.

Does the provision of the final decree, "any claim or demand which may arise after the entry of this decree," cover the claims of interveners? The final decree endeavored to take care of certain contingencies. It was expected apparently that there were matters, including certain claims and demands, that would arise thereafter requiring action, and that some would be claimed to be prior in lien or superior in equity to the mortgages. If these arose after the final decree, then they were not to be cut off by failure to file them in the receivership matter within the time provided in the notices.

While the demands of interveners had not been brought officially to the attention of the trial court until August, 1916, the attorneys of the Railroad Company and the receivers knew all about them prior thereto, for they were energetically contesting them in the courts. It would be quite natural that, knowing of these demands of the interveners be-

ing fought through the courts, and that the effort would, of course, be made to collect out of the property if they were eventually successful, they would arrange some provision in the decree to provide for just such demands if they ripened into established claims. The master interpreted the final decree to cover demands such as interveners presented, holding that the word "arise" was not used in the sense of "accrue"; that a claim could not accrue against the Railroad Company after the entry of the final decree, for the Railroad Company stopped functioning when the receivers were appointed, but that a claim could "arise" for the consideration and determination of the court after the entry of the final decree, and held these were such claims.

The trial court's conclusion was the reverse of this. We quote therefrom (North American Co. v. St. Louis & S. F. R. Co. (D. C.) 288 F. 612, 625) as follows: "The view of the special master was that the word 'arise' in the exception, 'other than any claim that may arise after the entry of this decree,' did not mean 'accrue,' and that, while the claims of the interveners did not accrue after the entry of the decree, they arose thereafter, and hence were excepted from what seems to the court to be the plain and comprehensive bar of all claims not presented as required by the interlocutory decree contained in that decree and in the final decree. But after thoughtful consideration the court is unable to adopt this view, or to resist the conclusion that the meaning of the word 'arise,' in the connection in which it is here used was identical with the meaning of the word 'accrue,' that none of the claims of the interveners either arose or accrued after the entry of the decree, and that they all fall under the ban of both decrees."

[11] The question, therefore, of the construction of this phrase of the final decree is of determinative importance. In arriving at the meaning of words, courts must take into consideration their conjunction with other words, and the purpose of their use. The words "arise" and "arising" are of frequent occurrence in the law, such as causes "arising under the Constitution and the law"; "unforeseen contingencies which may arise"; offenses "arising in the naval forces"; "causes of action arising." In United States v. Heth, 3 Cranch, 398, 413 (2 L. Ed. 479) the Supreme Court said: "The word 'arising' refers to the present time, or time to come, but cannot, with any propriety, relate to time past, and embrace former transactions." In Van Meter v. Coal Mining Co., 88 Iowa, 92, 98, 55 N. W. 106, 108, where the court

was dealing with the phrase "unforeseen contingencies which may arise," it considered the matter as "arisen" when it had "come into notice," or "become visible," and held that to be the meaning of the word "arise."

In Doughty v. Funk, 15 Okl. 643, 84 P. 484, 4 L. R. A. (N. S.) 1029, the court construed the word "arise" to mean something more than is meant by the term "accrues," as used in a particular section of the Oklahoma statute. In Macon Grocery Co. v. Atlantic Coast Line R. Co., 215 U. S. 501, 30 S. Ct. 184, 54 L. Ed. 300, the court refers to a number of cases in the Supreme Court which discuss the question of when a case may be said to "arise" under the Constitution of the United States. In Bogart, In re, Fed. Cas. No. 1,596, discussing the question of when an offense "arises" in the land or naval forces within the meaning of the Fifth Amendment to the Constitution, the court says: "Among the ordinary and most common definitions of the word 'arise,' are 'to proceed, to issue, to spring,'" Cyclopedia of Law and Procedure, vol. 3, p. 811, gives the same definition.

[12] In Moran v. Moran, 144 Iowa, 451, 123 N. W. 202, 30 L. R. A. (N. S.) 898, the Supreme Court of Iowa pointed out the difference between the words "accrue" and "arise" as used in a statute of limitations. In Love et al. v. North American Co. et al., 229 F. 103, 106, 143 C. C. A. 379, 382, this court said: "The claims of the shippers arose at the time the Supreme Court of Oklahoma decided the appeals." The Supreme Court of the United States in Southern Pacific Co. et al. v. Darnell, 245 U. S. 531, 38 S. Ct. 186, 62 L. Ed. 451, and Louisville Cement Co. v. Int. Com. Comm., 246 U. S. 638, 38 S. Ct. 408, 62 L. Ed. 914, discusses the question of when a claim or right of action accrues. The word "arise," in the decree, is not used, we think, as synonymous with "accrue," or in the sense of originating. It is used in the sense of the usual definition of the verb "arise"; that is, to appear; to become; to present itself. It is evident the receivers did not regard the claims of interveners as having arisen when the final decree was filed. They were required to file within a certain period of time a statement of unpaid indebtedness and liabilities of the Railroad Company incurred prior to their appointment, "and which so far as they are informed are claimed to be prior in lien or superior in equity to the refunding mortgage." They filed such list, but did not include any claims of interveners, although they must have known from the pending litigation all about them, doubtless assuming, as they were denying such claims and fighting their

establishment in the courts, that so far as they were concerned they were not claims that had as yet arisen for consideration of the court having the receivership in charge.

It might be suggested, also, that while the right of action here accrued in 1914, when the Commission made an order of reparation, the claims were not finally established until the decision of the Supreme Court of the United States. They had not appeared in the transactions being carried on in the receivership proceedings. Had the Supreme Court sustained the decision of this court, they never would have appeared. Interveners proceeded on the theory that they had the right under the final decree to present their claims as finally established by the Supreme Court of the United States. They were claims different from and unlike the ordinary creditors' claims. They must be prima facie established by the Commission's findings, and completely established by the judgment of a court. In any event we are satisfied that the word "arise" referred to claims or demands which had not been in the proceedings in the court up to the time the final decree was entered. The claims of interveners therefore did not "arise" in the receivership proceeding, as the term is used in the final decree, until the petitions of intervention were filed pursuant to the court's permission and order, thus bringing the matters before the court for its consideration.

If the final decree and order of confirmation constitute a contract between the court and the purchaser, it is not breached, as under article 9 of the decree the purchaser takes the property upon express condition that it will satisfy and discharge "(B) any unpaid claims of creditors of the defendant Railroad Company which have been or shall be admitted by the parties in interest or adjudged by this court to be prior in lien or superior in equity to the refunding mortgage or to the general lien mortgage," and under section (e), subdivision 2, article 10, these claims or demands of interveners are not barred from consideration, because they "arise after entry of this decree." The Railway Company took the property, therefore, subject to the claims of interveners, should they be allowed by the court as prior in lien or superior in equity to the mortgages. They expressly so agreed in accepting the property under the final decree.

[13] Interveners contend their claims set forth in the petitions of intervention are entitled to preferential allowance, with priority over claims of other creditors, including bondholders, on three distinct grounds, viz.:

(1) That they represent the excess freight charges unlawfully exacted from them or their assignors by duress, and that therefore the defendant Railroad Company became a trustee thereof ex maleficio for their benefit.

(2) That they come within the rule under which claims for labor, supplies and like necessities for the operation of a railroad are held to be preferential.

(3) That a sound public policy requires they be allowed as preferential claims.

In view of our conclusion as to the first proposition, we find it unnecessary to discuss the other two.

It is contended by appellees that the rates charged were the rates provided in the tariffs of the Railroad Company established, filed and published in conformity with the Interstate Commerce Act, and were the only rates which the Railroad Company could collect without a violation of the act; hence there was nothing of wrong in their collection.

Section 1, subdivision 3, of the Act to Regulate Commerce (U. S. Comp. St. 1916, § 8563), provides: "All charges made for any service rendered or to be rendered in the transportation of passengers or property * * * shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful." Section 6 of the act (U. S. Comp. Stat. 1916, § 8569), in force when the disputed rates were collected, provides for the filing and posting by the Railroad Company of schedules of rates for transportation of property, and prohibits charging a greater or different rate than that provided in these tariffs. The courts have held that, even if the rates were unreasonable, the shipper was bound to pay the same, and could later apply to the commission for reparation. Pennsylvania R. Co. v. International Coal Co., 230 U. S. 184, 33 S. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315; Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075. It was held by the Commission in 1905 that the rates complained of and involved here were unreasonable and unjust. The Railroad Company did not change its rates, and it is now insisted that, having refused to comply with the order of the Commission, and having refused to change its tariffs, it was protected and justified in exacting the amounts which the Commission has held to be unreasonable because it had published them as its tariff rates.

[14] It could not, it is true, collect otherwise than according to its published tariff rates; but it could have changed its tariffs in the

manner provided by the act to comply with section 1 thereof and the order of the Commission. The fact that the Railroad Company continued to maintain its tariffs the same as before said finding is not a defense to it for collecting unreasonable and unjust rates. The charging of an excessive and unreasonable rate is ipso facto unlawful. Darnell-Taenzer Lumber Co. v. Southern Pac. Co., 221 F. 890, 137 C. C. A. 460. A carrier cannot make such rates lawful by continuing to publish them under section 6 of the Interstate Commerce Act. After some 15 years of litigation it was settled that the Railroad Company had exacted unreasonable and unjust freight rates to the extent of 3 cents per hundredweight on the shipments involved.

[15] While ordinarily a trusteeship ex maleficio of money or property arises out of a fraud or deceit, there is no reason why it may not arise out of duress or in any other "unconscientious manner." 3 Pomeroy's Equity Jurisprudence, § 1053, states the rule as follows: "In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of one who is truly and equitably entitled to the same."

In Angle v. Chicago, St. P., M. & O. Ry. Co., 151 U. S. 1, 26, 14 S. Ct. 240, 250, 38 L. Ed. 55, the Supreme Court of the United States said: "It is familiar doctrine that a party who acquires title to property wrongfully may be adjudged a trustee ex maleficio in respect to that property." See also 1 Perry on Trusts, § 166; 26 R. C. L. §§ 82 and 83, p. 1236; Mercantile Trust Co. v. St. Louis & S. F. Ry. Co. (C. C.) 69 F. 193; Richardson v. New Orleans Debenture Redemption Co., 102 F. 780, 42 C. C. A. 619, 52 L. R. A. 67; Central Stock & Grain Exchange v. Bendinger, 109 F. 926, 48 C. C. A. 726, 56 L. R. A. 875; Ahrens v. Jones, 169 N. Y. 555, 62 N. E. 666, 88 Am. St. Rep. 620; Lamb v. Rooney et al., 72 Neb. 322, 100 N. W. 410, 117 Am. St. Rep. 795; Ryan et al. v. Dox, 34 N. Y. 307; In re Wise's Estate, 188 Pa. 258, 41 A. 526; 1 Pomeroy's Eq. Jur. 155.

A railroad company and a shipper do not stand on equal footing. A shipper is compelled to pay the rate provided in the tariff.

His life as a shipper is terminated if he is deprived of transportation to the market place, and if he pays an excessive and unjust rate provided by the tariff he is certainly acting under duress, and to the extent of the rate above a reasonable rate the Railroad Company should be held as a trustee ex maleficio for the shipper; the legal title to the exaction being in the Railroad Company, the beneficial title remaining in the shipper. The case of Love v. North American Co., 229 F. 103, 143 C. C. A. 379, would seem to be authority for this position. There excessive charges received by this same Railroad Company were held to belong to the shippers. This court there said (page 106 [143 C. C. A. 382]):

"The question now might be properly asked: To whom do the excessive charges received by the Frisco Company for the transportation of freight belong? They certainly do not belong to the general creditors of the Frisco Company, nor to the bondholders, nor the Frisco Company itself. Without question they belong to the shippers. We must not be deceived as to the true status of this claim, nor allow the bond, or the fact that the claim is presented by the Corporation Commission, to blind us to the fact that the claim is one due to the shippers for excessive charges paid by them to the Frisco Company for transportation of freight. The shippers not only paid the lawful charge, but they did more. They paid an excessive charge. That payment was an illegal exaction, and, as against the railroad company and volunteers, like the receivers, the money belonged to the shippers after the payment, the same as before. It will be presumed that it was a part of the money in the treasury of the company which passed to the receivers. That money came into the hands of a court of equity. What ought such a court to have done with it? Surely it could do nothing but direct that it be returned to the shippers, to whom it belonged. It having been paid to the bondholders, or for permanent betterment of the property for their benefit through the agency of a court of equity, that court, as a court of conscience, can do no less than direct its restoration."

In Southern Pac. Co. v. Darnell-Taenzer Co., 245 U. S. 531, 534, 38 S. Ct. 186, 62 L. Ed. 451, the Supreme Court said: "The carrier ought not to be allowed to retain his illegal profit."

[16] Appellees strongly urge in their brief that the trust fund theory cannot apply to make these claims preferential, and give priority, because the moneys received for the

freight charges were used by the Company the same as other moneys, and that neither the Railroad Company nor the receivers retained the same in a separate fund; that they were commingled with other moneys of the Railroad Company in the various banks, and may have gone into an account which was wholly wiped out; that the proceeds cannot be followed into the hands of the receivers, and the lien claimed thereon, but that the most interveners could claim would be to come in as general creditors. Of course, it is true that these moneys wrongfully exacted in freight rates were commingled with other funds, and cannot be traced in any separate and distinct fund into the hands of the receivers. They were not in any way earmarked. If that is essential to create a trusteeship ex maleficio, and give to interveners the status of preferred creditors, then they must fail.

While it has been held by the courts, in order for a cestui que trust to claim the right to preferential payment by a receiver out of proceeds of the estate of an insolvent, "that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver" (Empire State Surety Co. v. Carroll County et al., 194 F. 593, 604, 114 C. C. A. 435; Weideman v. Newton Arms Co. [C. C. A.] 271 F. 302), yet the case of Love et al. v. North American Co. et al., 229 F. 103, 143 C. C. A. 379, is the latest expression of this court on the subject, and is authority for the proposition that, in order to establish a trust in a railroad company for the benefit of the shipper as to freight charges wrongfully exacted, it is not necessary to show that the identical money received has been placed in a separate account, or to trace the identical fund. It is established by the record here that at all times after the excessive freight charges were collected, and down to the receivership, the Railroad Company had in its treasury money in excess of the claimed overcharges, and that it turned over to the receiver some $300,000. Under the doctrine of the Love Case it will be presumed that the money exacted by duress from the interveners and their assignors for unjust and excessive freight rates was a part of the money in the treasury of the company which passed to the receivers. Efforts are made in argument to distinguish the Love Case from this, but on the question we are now considering there is no substantial difference.

[17] It is insisted that the action to charge the Railroad Company as a trustee ex male-ficio cannot be maintained, because the same is not consistent with the Act to Regulate Commerce, and that such act prescribes an exclusive remedy by reparation. The act does provide for reparation. It also provides, in section 22 (Comp. St. § 8595), that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."

In Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 446, 27 S. Ct. 350, 358, 51 L. Ed. 553, 9 Ann. Cas. 1075, the Supreme Court, referring to section 22, said: "This clause, however, cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." This decision settles the proposition that common-law remedies inconsistent with provisions of the act cannot be resorted to, but, if these common-law remedies are not inconsistent with the act, they are not abrogated. Section 22 is not inconsistent with the provision providing for a suit for damages. The equitable remedy to impress a trust on money wrongfully and unlawfully taken from a shipper is not destroyed by the procedure to secure a judgment for repayment of the same. It is postponed, of course, until after action by the Commission and possibly by the courts. If interveners had gone into the receivership proceedings and attempted to enforce the trust without having their right to reparation first established by the Commission, the court would undoubtedly have required them to proceed first before the Commission. They endeavored to secure the establishment of their claims as judgments before attempting to impress a trust upon the fund.

We see no inconsistency in this. The equitable remedy merely assists in bringing about justice by the impression of a trust and makes possible a realization upon the judgments. It is in aid of the judgments. We see no reason why an action at law for money had and received bars an equitable right to enforce a trust ex maleficio, after said judgment is secured, in aid thereof. Interveners had only the one remedy at the time they proceeded before the Interstate Commerce Commission, and that remedy had to be pursued to a conclusion before any other became available. Consequently there is no doctrine applicable to that situation of election of remedies. 20 C. J. p. 21. Further, as said in 39 Cyc. p. 591: "As a general rule the jurisdic-

tion of equity in establishing and enforcing trusts is in addition to and concurrent with any remedies at law the party may have." See, also, 6 L. R. A. (N. S.) 793; Fitzgerrell v. Federal Trust Co. (Mo. App.) 187 S. W. 600; Krippendorf v. Hyde & Another, 110 U. S. 276, 4 S. Ct. 27, 28 L. Ed. 145.

[18] It is also argued that under section 16 of the Act to Regulate Commerce interveners can have no other status than general unsecured creditors with no rights of priority, because the act provides for collecting "damages." While the statute refers to the right to collect damages, the damages in this case are the amounts of money wrongfully taken. There is no particular sanctity surrounding the term "damages." As pointed out in the master's conclusions of law, if money is taken from a party by duress, he is damaged; if it is taken from him by a highwayman at the point of a revolver, he is damaged; if it is taken from him by deceit and fraud, he is damaged, and he may sue for tort, or he may sue to impress a trust. In Mills v. Lehigh Valley R. R. Co., 238 U. S. 473, 481, 482, 35 S. Ct. 888, 892 (59 L. Ed. 1414), the court said:

"What the Commission decided was that the shippers were entitled to reparation—that is, to be made whole, to be compensated for a loss because of an illegal and unreasonable exaction—and the amount which they stated as the sum to be paid 'as reparation' on the specified shipments was the amount which they found necessary to accomplish the reparation, to afford the compensation. The statute was not concerned with mere forms of expression and in view of the decision that a finding of the ultimate fact of the amount of damage is enough to give the order of the Commission effect as prima facie evidence, we think that the trial court did not err in its ruling. The statutory provision merely established a rule of evidence. It leaves every opportunity to the defendant to contest the claim; but, when the Commission has found that there was damage to a specified extent, prima facie the damage is shown."

It may be observed that the judgments in the cases in the United States District Court at Kansas City were not for damages in the usual and technical sense of that term. We quote from the entry in the E. B. Spiller case: "It is further ordered, adjudged, and decreed by the court that plaintiff, E. B. Spiller, do have and recover of and from the defendant, St. Louis & San Francisco Railroad Company the sum of twenty-seven thousand six hundred eighty-two and 75/100 dollars ($27,682.-

75), being the amount of principal and interest ordered by the Interstate Commerce Commission to be paid to the plaintiff, E. B. Spiller, by the said St. Louis & San Francisco Railroad Company on or before June 15, 1914, and do have and recover of and from said defendant the further sum of two thousand five hundred twenty-nine and 56/100 dollars ($2,529.56), being the interest at 6 per cent. per annum on said sum of $27,682.-75 from June 15, 1914, to August 1, 1916, being a total sum of thirty thousand two hundred twelve and 31/100 dollars ($30,212.31), together with interest thereon from August 1, 1916, at 6 per cent. per annum until paid."

However, interveners were damaged to the extent of the money wrongfully taken from them. No other damage was claimed. It makes little difference what technical words may be used to describe what may be recovered, the judgment was for moneys paid by interveners and their assignors above reasonable and just rates for the transportation of property. Spiller v. Atchison, T. & S. F. Ry. Co., 253 U. S. 117, 40 S. Ct. 466, 64 L. Ed. 810.

It is true that interveners never attempted to enforce the trust until the intervening petitions were filed on December 2, 1920. It may be that there are other methods of procedure which might better have been followed, but we are not convinced that interveners were estopped to assert the trust theory after final judgment by reason of not having before asserted it, especially in view of all the circumstances surrounding these transactions and the fact that full notice was given to the Railway Company before the foreclosure sale was confirmed of interveners' claims of priority by reason of the wrongful collection of the excessive rates. [19] We do not think the interveners are entitled to recover upon the theory of the rule underlying the right to preferential claims of labor, supplies, etc., and agree with the decision of the trial court as to that question; nor is it necessary to consider the question of public policy urged; nor in view of our conclusion as to a trusteeship ex maleficio is it necessary to consider the effect of the doctrine announced in Northern Pacific Ry. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931, as to the right of a creditor, who has received no fair offer in the reorganization plan of cash or participation, to subject the interest of the old stockholders in the property to the payment of his claims. It may be suggested that the interveners received no offer of any kind, and that the stockholders of the Railroad Company have

been given an interest in the reorganized Railway Company to the extent of more than $45,000,000.

[20] Under the theory we have adopted as applicable to the facts of these cases, the claims for attorney fees cannot be established as preferential claims. It would seem a reproach to equity if it did not afford a remedy to interveners under the situation presented by this record. Against the constant opposition of the Railroad Company, its receivers, and the Railway Company their claims have been established in the District Court and the Supreme Court of the United States. Other creditors, bondholders, mortgagees, stockholders, acquired no interest of any kind in these excessive and unjust charges. Preferential allowance of the claims arising therefrom takes nothing from them to which they are entitled. The Railway Company received the property of the Railroad Company subject to these claims, if allowed by the court, as we have before pointed out, and hence suffers no wrong. Every consideration of equity and fair dealing demands that these claims should not be lost in a labyrinth of technicalities.

We hold that appellants were not guilty of inexcusable laches, and that it was error to dismiss their petitions upon that ground; that they are not precluded by the final decree and order of the confirmation of sale from asserting the claims set forth in the petitions of intervention; that the Railroad Company, in collecting the overcharges, became a trustee ex maleficio of interveners' funds, and that the Railway Company accepted said properties subject to these claims, should they be allowed by the court; that intervener E. B. Spiller is entitled to have the claims set forth in his petition of intervention established in the sum of $30,212.31 (not including any attorney fees), with interest from August 1, 1916, and interveners E. B. Spiller et al. are entitled to have their claims established in the sum of $3,652.97 (not including attorney fee), with interest at 6 per cent. from August 1, 1916, as preferential claims superior to the rights of other creditors, including the bondholders, and the order and decree of the trial court dismissing the interveners' petitions is reversed, and the case is remanded, with instructions to enter judgment for the amounts herein set forth, the same to be adjudged as prior in lien and superior in equity to the refunding mortgage and general lien mortgage of the St. Louis & San Francisco Railroad Company, and directed to be enforced against the property conveyed to the St.

Louis & San Francisco Railway Company as assignee of the purchasers at the foreclosure sale had in the consolidated receivership case.

Reversed and remanded.